# CITY OF HOUSTON, TEXAS *v.* HILL

No. 86–243.   Argued March 23, 1987—Decided June 15, 1987

452

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-
SHALL, BLACKMUN, and STEVENS, JJ., joined. BLACKMUN, J., filed a
concurring opinion, *post*, p. 472. SCALIA, J., filed an opinion concurring in
the judgment, *post*, p. 472. POWELL, J., filed an opinion concurring in the
judgment in part and dissenting in part, in which O'CONNOR, J., joined, in
Parts I and II of which REHNQUIST, C. J., joined, and in Parts II and III of
which SCALIA, J., joined, *post*, p. 473. REHNQUIST, C. J., filed a dissent-
ing opinion, *post*, p. 481.

*Robert J. Collins* argued the cause for appellant. With
him on the briefs was *Jerry Edwin Smith.*

*Charles Alan Wright* argued the cause for appellee. With him on the brief were *Michael A. Maness* and *Gerald M. Birnberg.*\*

JUSTICE BRENNAN delivered the opinion of the Court.

This case presents the question whether a municipal ordinance that makes it unlawful to interrupt a police officer in the performance of his or her duties is unconstitutionally overbroad under the First Amendment.

## I

Appellee Raymond Wayne Hill is a lifelong resident of Houston, Texas. At the time this lawsuit began, he worked as a paralegal and as executive director of the Houston Human Rights League. A member of the board of the Gay Political Caucus, which he helped found in 1975, Hill was also affiliated with a Houston radio station, and had carried city and county press passes since 1975. He lived in Montrose, a "diverse and eclectic neighborhood" that is the center of gay political and social life in Houston. App. 26–27.

The incident that sparked this lawsuit occurred in the Montrose area on February 14, 1982. Hill observed a friend, Charles Hill, intentionally stopping traffic on a busy street, evidently to enable a vehicle to enter traffic. Two Houston police officers, one of whom was named Kelley, approached Charles and began speaking with him. According to the District Court, "shortly thereafter" Hill began shouting at the officers "in an admitted attempt to divert Kelley's attention from Charles Hill." App. to Juris. Statement B–2.[1] Hill

---

\**Alvin Bronstein, David Goldstein, Burt Neuborne, James Harrington,* and *Bruce Griffiths* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

[1] Hill testified that his "motivation was to stop [the officers] from hitting Charles." App. 37, 40. See n. 2, *infra.* He also explained: "I would rather that I get arrested than those whose careers can be damaged; I would rather that I get arrested than those whose families wouldn't understand; I would rather that I get arrested than those who couldn't spend a long time in jail. I am prepared to respond in any legal, nonaggressive or

first shouted: "Why don't you pick on somebody your own size?" After Officer Kelley responded: "[A]re you interrupting me in my official capacity as a Houston police officer?" Hill then shouted: "Yes, why don't you pick on somebody my size?" App. 40–41, 58, 71–74. Hill was arrested under Houston Code of Ordinances, § 34–11(a), for "wilfully or intentionally interrupt[ing] a city policeman . . . by verbal challenge during an investigation." App. 2. Charles Hill was not arrested. Hill was then acquitted after a nonjury trial in Municipal Court.[2]

---

nonviolent way, to any illegal police activity, at any time, under any circumstances." *Id.*, at 29.

[2] The District Court stated that Hill "shout[ed] *abuses*" at the officers, App. to Juris. Statement B–2 (emphasis added). As the Court of Appeals held, however, there is "no evidence to support the district court's finding that Raymond [Hill] 'shout[ed] abuses' at Officer Kelley." 789 F. 2d 1103, 1105 (CA5 1986). See App. 73–74 (testimony of Officer Kelley that Hill did not use "abusive" language).

The testimony of Hill and Kelley is consistent in other ways ignored by the District Court. Both agree, for example, that Charles attempted to leave after an initial conversation with the officers, and that Kelley then grabbed Charles by the arm, turned him around, and told him not to walk away. *Id.*, at 14, 57. According to Hill, Charles, who "has a nervous tic," then went "into these spasms," which prompted one of the officers to "screa[m]" at Charles "Are you making fun of me?" *Id.*, at 14–15. Kelley stated that Charles was "twitching" in an "erratic and strange" manner, and that Kelley "didn't know if [Charles] was about to have a seizure or if he was being insolent or what." *Id.*, at 56–57.

At this point, however, the testimony substantially diverges. Kelley states that Hill then "interrupte[d]" him with the verbal challenge quoted in text, and that a crowd was beginning to form. *Id.*, at 57–58, 61, 68–69. Hill testified that both officers grabbed Charles, placed him up against a wall, and threatened to hit him with a large flashlight. *Id.*, at 14. Only then, according to Hill, did he call out: "[T]he kid has done nothing wrong. If you want to pick on somebody, pick on me." *Id.*, at 16. We note the applicability of JUSTICE POWELL's observation that there is a "possibility of abuse" where convictions under an ordinance frequently turn on the resolution of a "direct conflict of testimony as to 'who said what.'" *Lewis* v. *City of New Orleans*, 415 U. S. 130, 135, n. (1974) (POWELL, J., concurring in result). See *infra*, at 466.

Code of Ordinances, City of Houston, Texas, § 34–11(a) (1984), reads:

"Sec. 34–11. Assaulting or interfering with policemen.

"(a) It shall be unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest."[3]

Following his acquittal in the Charles Hill incident, Hill brought the suit in the Federal District Court for the Southern District of Texas, seeking (1) a declaratory judgment that § 34–11(a) was unconstitutional both on its face and as it had been applied to him, (2) a permanent injunction against any attempt to enforce the ordinance, (3) an order expunging the records of his arrests under the ordinance, and (4) damages and attorney's fees under 42 U. S. C. §§ 1983 and 1988.

At trial, Hill introduced records provided by the city regarding both the frequency with which arrests had been made for violation of the ordinance and the type of conduct with which those arrested had been charged. He also introduced evidence and testimony concerning the arrests of several reporters under the ordinance. Finally, Hill introduced evidence regarding his own experience with the ordinance, under which he has been arrested four times since 1975, but never convicted.

The District Court held that Hill's evidence did not demonstrate that the ordinance had been unconstitutionally applied.[4] The court also rejected Hill's contention that the

---

[3] A conviction under the ordinance is a misdemeanor punishable by a fine of not more than $200. App. to Juris. Statement B–1.

[4] The facts of Hill's other three arrests as found by the District Court are as follows. On August 31, 1975, Hill intentionally interrupted two Houston police officers as they made a traffic arrest. During the arrest, Hill wrote down license plate numbers, and then walked to within an arm's length of one of the officers on the side nearest the officer's revolver. The officer asked Hill to leave, but Hill instead moved closer. Hill was arrested, tried, and found not guilty.

In 1977, after observing vice-squad cars parked near a bookstore, Hill entered the store and announced on the public address system that police

ordinance was unconstitutionally vague or overbroad on its face. The ordinance was not vague, the court stated, because:

> "[t]he wording of the ordinance is sufficiently definite to put a person of reasonable intelligence on fair notice of what actions are forbidden. In particular, the Court finds that the use of words such as 'interrupt' are sufficiently clear by virtue of their commonly-understood, everyday definitions. Interrupt commonly means to cause one to cease, such as stopping someone in the middle of something. The Plaintiff, for example, clearly 'interrupted' the police officers regarding the Charles Hill incident." App. to Juris. Statement B–8.

The court also held that the statute was not overbroad because "the ordinance does not, at least facially, proscribe speech or conduct which is protected by the First Amendment." *Id.*, at B–12.

A panel of the Court of Appeals reversed. 764 F. 2d 1156 (CA5 1985). The city's suggestion for rehearing en banc was granted, and the Court of Appeals, by a vote of 8–7, upheld the judgment of the panel. 789 F. 2d 1103 (1986). The Court of Appeals agreed with the District Court's conclusion that the ordinance was not vague, and that it "plainly encompasse[d] mere verbal as well as physical conduct." *Id.*, at 1109. Applying the standard established in *Broadrick* v. *Oklahoma*, 413 U. S. 601 (1973), however, the Court of Appeals concluded that the ordinance was substantially

---

officers were present and that patrons should prepare to show their identification. The patrons promptly left the store, thereby frustrating the investigation. Hill was arrested for interfering with the investigation, but the case was subsequently dismissed.

Finally, on October 3, 1982, eight months after the lawsuit began, Hill was arrested for refusing to leave the immediate area of a car with an unknown and unconscious person inside. The arresting officers failed to appear in Municipal Court, however, so the charge against Hill was dismissed.

overbroad. It found that "[a] significant range of protected speech and expression is punishable and might be deterred by the literal wording of the statute." 789 F. 2d, at 1110.

The Court of Appeals also reviewed the evidence of the unconstitutional application of the ordinance which Hill had introduced at trial. The court did not disturb the District Court's ruling that the statute had not been unconstitutionally applied to Hill or to the reporters. It did conclude, however, that other evidence not mentioned by the District Court revealed "a realistic danger of, and a substantial potential for, the unconstitutional application of the ordinance." *Ibid.* This evidence showed that the ordinance "is officially regarded as penalizing the mere interruption of a policeman while in the line of duty," *id.,* at 1109, and has been employed to make arrests for, *inter alia,* "arguing," "[t]alking," "[i]nterfering," "[f]ailing to remain quiet," "[r]efusing to remain silent," "[v]erbal abuse," "[c]ursing," "[v]erbally yelling," and "[t]alking loudly, [w]alking through scene." *Id.,* at 1113–1114.[5]

The city appealed, claiming that the Court of Appeals erred in holding the ordinance facially overbroad and in not abstaining until the ordinance had been construed by the

---

[5] These charges are summarized in an appendix to the opinion of the Court of Appeals, 789 F. 2d, at 1113–1114. The court noted that "[appellee] offered evidence of over 200 arrests that had been made for violation of the ordinance between November 1981 and March 1982. Violations are apparently so frequent that the City uses a printed form to report charges." *Id.,* at 1107. The form, entitled "Complaint: Interrupting a Policeman," contains the preprinted charge of "wilfully or intentionally interrupt[ing] a city policeman" that is followed by a blank in which the officer fills in a description of the basis for the charge. *Id.,* at 1108–1109. While noting that the majority of those arrested are charged with conduct that is "patently unlawful," the Court of Appeals observed that "[i]n many instances . . . the malefactor is described [in the handwritten portion] as having done nothing more offensive to the public order than speaking or failing to remain silent." *Id.,* at 1109. Over a third of these arrests were never prosecuted. *Id.,* at 1110.

state courts.[6]  We noted probable jurisdiction, 479 U. S. 811 (1986), and now affirm.

## II

The elements of First Amendment overbreadth analysis are familiar.  Only a statute that is substantially overbroad may be invalidated on its face.  *New York* v. *Ferber,* 458 U. S. 747, 769 (1982); *Broadrick* v. *Oklahoma, supra.*  "We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application . . . ."  *Id.,* at 630 (BRENNAN, J., dissenting).  Instead, "[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct."  *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.,* 455 U. S. 489, 494 (1982);

---

[6] The city also claims that the Court of Appeals engaged in improper factfinding.  The city notes that the District Court found that the ordinance had not been unconstitutionally applied, and argues that the Court of Appeals erred in reviewing Hill's evidence and concluding that it showed a potential for unconstitutional application.  Such a conclusion was foreclosed, according to the city, by the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a).  Brief for Appellant 40.

This argument is without merit.  An independent review of the record is appropriate where the activity in question is arguably protected by the Constitution.  *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886, 915–916, n. 50 (1982).  Moreover, the Court of Appeals *accepted* as "not challenged on appeal" the District Court's finding that the ordinance had not been unconstitutionally applied to Hill or to the reporters, 789 F. 2d, at 1107, 1110.  The disagreement between the lower courts was therefore limited to a question of law—whether the ordinance on its face was substantially overbroad.  In concluding that the ordinance was overbroad, the Court of Appeals did not err in reviewing evidence ignored by the District Court concerning the application of the ordinance, and in concluding that this evidence demonstrated a significant *potential* for unconstitutional application of the ordinance.

The question whether the ordinance has been unconstitutionally applied to Hill is neither presented by this appeal nor essential to our decision, and we do not address it.

*Kolender* v. *Lawson*, 461 U. S. 352, 359, n. 8 (1983). Criminal statutes must be scrutinized with particular care, *e. g.*, *Winters* v. *New York*, 333 U. S. 507, 515 (1948); those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application. *E. g.*, *Kolender*, *supra*, at 359, n. 8.

The city's principal argument is that the ordinance does not inhibit the exposition of ideas, and that it bans "core criminal conduct" not protected by the First Amendment. Brief for Appellant 12. In its view, the application of the ordinance to Hill illustrates that the police employ it only to prohibit such conduct, and not "as a subterfuge to control or dissuade free expression." *Ibid.* Since the ordinance is "content-neutral," and since there is no evidence that the city has applied the ordinance to chill particular speakers or ideas, the city concludes that the ordinance is not substantially overbroad.[7]

---

[7]The city's threshold argument that Hill lacks standing is without merit. The basis for the argument is the District Court's finding that the ordinance has been constitutionally applied to Hill in the past. This finding is irrelevant, however, to the question of Hill's standing to seek prospective relief. Hill has shown "a genuine threat of enforcement" of the ordinance against his future activities, *Steffel* v. *Thompson*, 415 U. S. 452, 475 (1974). Compare, *e. g.*, n. 1, *supra* (testimony of Hill's willingness to interrupt officers in the future), with *Golden* v. *Zwickler*, 394 U. S. 103 (1969) (intervening event rendered unlikely any future application of statute to appellee); see also App. to Juris. Statement B–3, n. 1 (District Court finding that Hill "is a gay rights activist who claims that the Houston police have 'systematically' harassed him 'as the direct result' of his sexual preferences"). Moreover, although we have never required that a plaintiff "undergo a criminal prosecution" to obtain standing to challenge the facial validity of a statute, *Doe* v. *Bolton*, 410 U. S. 179, 188 (1973), the fact that Hill has already been arrested four times under the ordinance lends compelling support to the threat of future enforcement. We therefore agree with the Court of Appeals that "Hill's record of arrests under the ordinance and his adopted role as citizen provocateur" give Hill standing to challenge the facial validity of the ordinance. 789 F. 2d, at 1107. Cf. *Ellis* v. *Dyson*, 421 U. S. 426 (1975).

We disagree with the city's characterization for several reasons. First, the enforceable portion of the ordinance deals not with core criminal conduct, but with speech. As the city has conceded, the language in the ordinance making it unlawful for any person to "assault" or "strike" a police officer is pre-empted by the Texas Penal Code. Reply Brief for Appellant 10. The city explains, *ibid.*, that "any species of physical assault on a police officer is encompassed within the provisions [§§ 22.01, 22.02] of the Texas Penal Code,"[8] and under § 1.08 of the Code, "[n]o governmental subdivision or agency may enact or enforce a law that makes any conduct covered by this code an offense subject to a criminal penalty."

---

[8] One who assaults or strikes either a police officer or "any person summoned to aid in making the arrest" may be arrested and prosecuted either under Tex. Penal Code Ann. § 22.01 (1974 and Supp. 1987), which renders unlawful any provocative contact with (or assault or threatened assault against) any person, or under Tex. Penal Code Ann. § 22.02 (1974), which renders unlawful conduct causing bodily injury to a peace officer. These sections provide in pertinent part:

"Section 22.01. Assault.

"(a) A person commits an offense if the person:

"(1) intentionally, knowingly, or recklessly causes bodily injury to another including the person's spouse; or

"(2) intentionally or knowingly threatens another with imminent bodily injury including the person's spouse; or

"(3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative."

"Section 22.02. Aggravated Assault.

"(a) A person commits an offense if he commits assault as defined in Section 22.01 of this code and he:

"(1) causes serious bodily injury to another;

"(2) causes bodily injury to a peace officer in the lawful discharge of official duty when he knows or has been informed the person is a peace officer; or

"(3) uses a deadly weapon.

"(b) The actor is presumed to have known the person assaulted was a peace officer if he was wearing a distinctive uniform indicating his employment as a peace officer."

Tex. Penal Code Ann. § 1.08 (1974). See *Knott* v. *State*, 648 S. W. 2d 20 (Tex. App. 1983) (reversing conviction obtained under municipal ordinance pre-empted by state penal code). Accordingly, the enforceable portion of the ordinance makes it "unlawful for any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty," and thereby prohibits verbal interruptions of police officers.[9]

Second, contrary to the city's contention, the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. "Speech is often provocative and challenging. . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello* v. *Chicago*, 337 U. S. 1, 4 (1949). In *Lewis* v. *City of New Orleans*, 415 U. S. 130 (1974), for example, the appellant was found to have yelled obscenities and threats at an officer who had asked appellant's husband to produce his driver's license. Appellant was convicted under a municipal ordinance that made it a crime "'for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty.'" *Id.*, at 132 (citation omitted). We vacated the conviction and invalidated the ordinance as facially overbroad. Critical to our decision was the fact that the ordinance "punishe[d] only spoken words" and was not limited in scope to fighting words that "'by their very utterance

---

[9] It is this portion of the ordinance to which Hill directed his constitutional challenge, see ¶¶ 6 and 27 of his complaint. Record 138, 144–145.

The Court of Appeals did not address the pre-emption issue; it assumed that the ordinance prohibited physical as well as verbal assaults, and still found the ordinance substantially overbroad. 789 F. 2d, at 1109. Because the city conceded pre-emption in this Court, see Reply Brief for Appellant 10, we need not address the question whether the ordinance, if not partially pre-empted, would be substantially overbroad.

inflict injury or tend to incite an immediate breach of the peace.'" *Id.*, at 133, quoting *Gooding* v. *Wilson*, 405 U. S. 518, 525 (1972); see also *ibid.* (Georgia breach-of-peace statute not limited to fighting words held facially invalid). Moreover, in a concurring opinion in *Lewis*, JUSTICE POWELL suggested that even the "fighting words" exception recognized in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942), might require a narrower application in cases involving words addressed to a police officer, because "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" 415 U. S., at 135 (citation omitted).

The Houston ordinance is much more sweeping than the municipal ordinance struck down in *Lewis*. It is not limited to fighting words nor even to obscene or opprobrious language, but prohibits speech that "in any manner . . . interrupt[s]" an officer.[10] The Constitution does not allow such speech to be made a crime.[11] The freedom of individuals ver-

---

[10] To the extent the ordinance could be interpreted to ban fighting words, it is pre-empted by Tex. Penal Code Ann. § 1.08 (1974), which pre-empts municipal laws that prohibit conduct subject to penalty under the Code, see *supra*, at 460–461, and by § 42.01, the State's comprehensive disorderly conduct provision. Subsection § 42.01(a)(1), which makes unlawful "abusive, indecent, profane or vulgar language" only if "by its very utterance [it] tends to incite an immediate breach of the peace," prohibits the use of fighting words. The "practice commentary" in the annotated Code confirms that this section is designed to track the "fighting words" exception set forth in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942). Tex. Penal Code Ann. § 42.01, pp. 124–125 (1974 and Supp. 1987).

[11] JUSTICE POWELL suggests that our analysis of protected speech sweeps too broadly. But if some constitutionally unprotected speech must go unpunished, that is a price worth paying to preserve the vitality of the First Amendment. " '[I]f absolute assurance of tranquility is required, we may as well forget about free speech. Under such a requirement, the only "free" speech would consist of platitudes. That kind of speech does not

bally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.[12]

need constitutional protection.'" *Spence* v. *Washington*, 418 U. S. 405, 416 (1974) (Douglas, J., concurring) (citation omitted).

In any case, today's decision does not leave municipalities powerless to punish physical obstruction of police action. For example, JUSTICE POWELL states that "a municipality constitutionally may punish an individual who chooses to stand near a police officer and persistently attempt to engage the officer in conversation while the officer is directing traffic at a busy intersection." *Post*, at 479. We agree, however, that such conduct might constitutionally be punished under a properly tailored statute, such as a disorderly conduct statute that makes it unlawful to fail to disperse in response to a valid police order or to create a traffic hazard. *E. g., Colten* v. *Kentucky*, 407 U. S. 104 (1972). What a municipality may not do, however, and what Houston has done in this case, is to attempt to punish such conduct by broadly criminalizing speech directed to an officer—in this case, by authorizing the police to arrest a person who in *any* manner verbally interrupts an officer.

JUSTICE POWELL also observes that "contentious and abusive" speech can interrupt an officer's investigation, and offers as an example a person who "run[s] beside [an officer pursuing a felon] in a public street shouting at the officer." *Post*, at 479. But what is of concern in that example is not simply contentious speech, but rather the possibility that by shouting and running beside the officer the person may physically obstruct the officer's investigation. Although that person might constitutionally be punished under a tailored statute that prohibited individuals from physically obstructing an officer's investigation, he or she may not be punished under a broad statute aimed at speech.

[12] This conclusion finds a familiar echo in the common law. See, *e. g., The King* v. *Cook*, 11 Can. Crim. Cas. Ann. 32, 33 (B. C. County Ct. 1906) ("Cook . . . a troublesome, talkative individual, who evidently regards the police with disfavour and makes no secret of his opinions on the subject . . . [told] some persons in a tone of voice undoubtedly intended for [the officer's] ears, that the arrested man was not drunk and the arrest was unjustifiable. Now up to this point he had committed no crime, as in a free country like this citizens are entitled to express their opinions without thereby rendering themselves liable to arrest unless they are inciting others to break the law; and policemen are not exempt from criticism any more than Cabinet Ministers"); *Levy* v. *Edwards*, 1 Car. & P. 40, 171

The city argues, however, that even if the ordinance encompasses some protected speech, its sweeping nature is both inevitable and essential to maintain public order. The city recalls this Court's observation in *Smith* v. *Goguen*, 415 U. S. 566, 581 (1974):

> "There are areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision. Control of the broad range of disorderly conduct that may inhibit a policeman in the performance of his official duties may be one such area requiring as it does an on-the-spot assessment of the need to keep order."

The city further suggests that its ordinance is comparable to the disorderly conduct statute upheld against a facial challenge in *Colten* v. *Kentucky*, 407 U. S. 104 (1972).

---

Eng. Rep. 1094 (Nisi Prius 1823) (where constable breaks up fight between two boys and proceeds to handcuff one of them, third party who objects by telling constable " 'you have no right to handcuff the boy' " has done no wrong and may not be arrested); cf. *Ruthenbeck* v. *First Criminal Judicial Court of Bergen Cty.*, 7 N. J. Misc. 969, 147 A. 625 (1929) (vacating conviction for saying to police officer "You big muttonhead, do you think you are a czar around here?"). See generally Note, Obstructing A Public Officer, 108 U. Pa. L. Rev. 388, 390–392, 406–407 (1960) ("[C]onduct involving only verbal challenge of an officer's authority or criticism of his actions . . . operates, of course, to impair the working efficiency of government agents. . . . Yet the countervailing danger that would lie in the stifling of all individual power to resist—the danger of an omnipotent, unquestionable officialdom—demands some sacrifice of efficiency . . . to the forces of private opposition. . . . [T]he strongest case for allowing challenge is simply the imponderable risk of abuse—to what extent realized it would never be possible to ascertain—that lies in the state in which no challenge is allowed").

The freedom verbally to challenge police action is not without limits, of course; we have recognized that "fighting words" which "by their very utterance inflict injury or tend to incite an immediate breach of the peace" are not constitutionally protected. *Chaplinsky* v. *New Hampshire*, *supra*, at 572; *Gooding* v. *Wilson*, 405 U. S. 518, 522–525 (1972). See also *supra*, at 461–462, and n. 10.

This Houston ordinance, however, is not narrowly tailored to prohibit only disorderly conduct or fighting words,[13] and in no way resembles the law upheld in *Colten*.[14] Although we appreciate the difficulties of drafting precise laws, we have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them.[15] As the Court observed over a

---

[13] To the extent the ordinance did extend to disorderly conduct, it would be pre-empted by Tex. Penal Code Ann. § 42.01 (1974 and Supp. 1987), the comprehensive state disorderly conduct provision. See n. 10, *supra*.

[14] The ordinance challenged in *Colten v. Kentucky* stated:

"(1) A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, he:

.      .      .      .      .

"(f) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . ." Ky. Rev. Stat. § 437.016(1)(f) (Supp. 1968); see 407 U. S., at 108.

The Court upheld the ordinance against overbreadth challenge because the Kentucky Supreme Court had construed it so that it "infringe[d] no protected speech or conduct." *Id.*, at 111.

[15] See, *e. g.*, *Kolender v. Lawson*, 461 U. S. 352, 360–361 (1983) (identification requirement unconstitutional because it accords police "full discretion"); *Smith v. Goguen*, 415 U. S. 566, 575 (1974) ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections . . . [thereby] entrusting lawmaking 'to the moment-to-moment judgment of the policeman on his beat'"), quoting *Gregory v. Chicago*, 394 U. S. 111, 120 (1969) (Black, J., concurring); *Papachristou v. City of Jacksonville*, 405 U. S. 156, 170 (1972) (vagrancy ordinance "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure'"), quoting *Thornhill v. Alabama*, 310 U. S. 88, 97–98 (1940); *Coates v. Cincinnati*, 402 U. S. 611, 615–616 (1971) (statute prohibiting "annoying" conduct "contains an obvious invitation to discriminatory enforcement"). Like many of the ordinances in these cases, Houston's effectively grants police the discretion to make arrests selectively on the basis of the content of the speech. Such discretion is particularly repugnant given "[t]he eternal temptation . . . to arrest the speaker rather than to correct the conditions about which he complains." *Younger v. Harris*, 401 U. S. 37, 65 (1971) (Douglas, J., dissenting).

century ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States* v. *Reese*, 92 U. S. 214, 221 (1876). In *Lewis*, JUSTICE POWELL elaborated the basis for our concern with such sweeping, dragnet laws:

> "This ordinance, as construed by the Louisiana Supreme Court, confers on police a virtually unrestrained power to arrest and charge persons with a violation. Many arrests are made in 'one-on-one' situations where the only witnesses are the arresting officer and the person charged. All that is required for conviction is that the court accept the testimony of the officer that obscene or opprobrious language had been used toward him while in the performance of his duties.*. . .
>
> "Contrary to the city's argument, it is unlikely that limiting the ordinance's application to genuine 'fighting words' would be incompatible with the full and adequate performance of an officer's duties. . . . [I]t is usually unnecessary [to charge a person] with the less serious offense of addressing obscene words to the officer. The present type of ordinance tends to be invoked only where there is no other valid basis for arresting an objectionable or suspicious person. The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.
>
> "*The facts in this case, and particularly the direct conflict of testimony as to 'who said what,' well illustrate the possibility of abuse."

415 U. S., at 135–136, and n.

Houston's ordinance criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement. The ordinance's plain language is admittedly violated scores of times daily, App. 77, yet only some individuals—those chosen by the po-

lice in their unguided discretion—are arrested.   Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," *NAACP* v. *Button*, 371 U. S. 415, 433 (1963), the ordinance is susceptible of regular application to protected expression.   We conclude that the ordinance is substantially overbroad, and that the Court of Appeals did not err in holding it facially invalid.

## III

The city has also urged us not to reach the merits of Hill's constitutional challenge, but rather to abstain for reasons related to those underlying our decision in *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941).   In its view, there are certain limiting constructions readily available to the state courts that would eliminate the ordinance's overbreadth.[16]

Abstention is, of course, the exception and not the rule, *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 813 (1976), and we have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment.[17]   We have held that "abstention . . . is inappropriate for cases [where] . . . statutes are justifiably attacked on their face as abridging free expression." *Dombrowski* v. *Pfister*, 380 U. S. 479, 489–490 (1965).   "In such case[s] to force the plaintiff who has commenced a federal ac-

---

[16] The city did not raise the abstention issue until after it had lost on the merits before the panel of the Court of Appeals.   After rehearing en banc, neither the majority nor the dissent addressed abstention.   The city's tardy decision to urge abstention is remarkable given its acquiescence for more than three years to federal adjudication of the merits and its insistence before the District Court and the panel that the ordinance was both unambiguous and constitutional on its face.   These circumstances undercut the force of the city's argument, but do not bar us from considering it. *Wisconsin* v. *Constantineau*, 400 U. S. 433 (1971); *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941).

[17] See *Dombrowski* v. *Pfister*, 380 U. S. 479, 486–487 (1965); *Procunier* v. *Martinez*, 416 U. S. 396, 404 (1974); *Baggett* v. *Bullitt*, 377 U. S. 360, 378–379 (1964); *NAACP* v. *Button*, 371 U. S. 415, 433 (1963); but cf. *Babbitt* v. *Farm Workers*, 442 U. S. 289 (1979).

tion to suffer the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler* v. *Koota*, 389 U. S. 241, 252 (1967).

Even if this case did not involve a facial challenge under the First Amendment, we would find abstention inappropriate. In cases involving a facial challenge to a statute, the pivotal question in determining whether abstention is appropriate is whether the statute is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question." *Harman* v. *Forssenius*, 380 U. S. 528, 534–535 (1965); see also *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 236 (1984) (same). If the statute is not obviously susceptible of a limiting construction, then even if the statute has "never [been] interpreted by a state tribunal . . . it is the duty of the federal court to exercise its properly invoked jurisdiction." *Harman, supra*, at 535; see, *e. g., Wisconsin* v. *Constantineau*, 400 U. S. 433, 439 (1971) ("Where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim"); *Zwickler* v. *Koota, supra*, at 250–251, and n. 14 (citing cases).

This ordinance is not susceptible to a limiting construction because, as both courts below agreed, its language is plain and its meaning unambiguous. Its constitutionality cannot "turn upon a choice between one or several alternative meanings." *Baggett* v. *Bullitt*, 377 U. S. 360, 378 (1964); cf. *Babbitt* v. *Farm Workers*, 442 U. S. 289, 308 (1979). Nor can the ordinance be limited by severing discrete unconstitutional subsections from the rest. For example, it cannot be limited to "core criminal conduct" such as physical assaults or fighting words because those applications are pre-empted by state law. See *supra*, at 460–461, and n. 10. The enforceable portion of this ordinance is a general prohibition of speech that "simply has no core" of constitutionally unprotected expression to which it might be limited. *Smith* v.

*Goguen,* 415 U. S., at 578 (emphasis deleted). The city's proposed constructions are insufficient,[18] and it is doubtful that even "a remarkable job of plastic surgery upon the face of the ordinance" could save it. *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 153 (1969). In sum, "[s]ince 'the naked question, uncomplicated by [ambiguous language], is whether the Act on its face is unconstitutional,' *Wisconsin* v. *Constantineau,* 400 U. S. 433, 439 (1971), abstention from federal jurisdiction is not required." *Hawaii Housing Authority, supra,* at 237.

The city relies heavily on its claim that the state courts have not had an opportunity to construe the statute. Even if true, that factor would not in itself be controlling. As stated above, when a statute is not ambiguous, there is no need to abstain even if state courts have never interpreted the statute. *Harman, supra,* at 534. For example, we have declined to abstain from deciding a facial challenge to a state statute when the suit was filed in federal court just four days after the statute took effect. *Brockett* v. *Spokane Arcades, Inc.,* 472 U. S. 491 (1985). But in any event, the city's claim that state courts have not had an opportunity to construe the statute is misleading. Only the state *appellate* courts appear to have lacked this opportunity. It is undisputed that Houston's Municipal Courts, which have been courts of

---

[18] The city suggests that the statute would be constitutional if construed to apply only to (1) intentional interruptions by (2) "physical, rather than verbal, acts" during (3) an officer's attempts to make "arrests and detentions." Brief for Appellant 30–31. These proposals are either at odds with the ordinance's plain meaning, or do not sufficiently limit its scope. First, speech does not necessarily lose its constitutional protection because the speaker intends it to interrupt an officer, nor would an intent requirement cabin the excessive discretion the ordinance provides to officers. Second, given the pre-emption of the first part of the statute, discussed *infra,* limiting the ordinance to "physical acts" would be equivalent to invalidating it on its face. Third, there is no reasonable way to read the plain language of the ordinance as limited to arrests and detentions; even if there were, such a limitation would not significantly limit its scope.

record in Texas since 1976, have had numerous opportunities to narrow the scope of the ordinance.[19]   There is no evidence that they have done so.[20]   In fact, the city's primary position throughout this litigation has been "to insis[t] on the validity of the ordinance as literally read."   789 F. 2d, at 1107.   We have long recognized that trial court interpretations, such as those given in jury instructions, constitute "a ruling on a question of state law that is as binding on us as though the precise words had been written into the ordinance."   *Terminiello*, 337 U. S., at 4.   Thus, where municipal courts have regularly applied an unambiguous statute, there is certainly no need for a federal court to abstain until state appellate courts have an opportunity to construe it.

The possibility of certification does not change our analysis.[21]   The certification procedure is useful in reducing the substantial burdens of cost and delay that abstention places on litigants.   Where there is an uncertain question of state law that would affect the resolution of the federal claim, and where delay and expense are the chief drawbacks to abstention, the availability of certification becomes an important factor in deciding whether to abstain.   *E. g., Bellotti* v. *Baird*, 428 U. S. 132 (1976).   Nevertheless, even where we have recognized the importance of certification in deciding whether to abstain, we have been careful to note that the

---

[19] The ordinance has been in force, in substantially the same language, for over 30 years.   789 F. 2d, at 1111.   The Houston police arrest on average 1,000 persons per year under the ordinance.   Brief for Appellee 14, 35 (citing Record).

[20] Indeed, Hill introduced evidence in the District Court that Houston's Municipal Courts have declined to employ limiting constructions in jury instructions.   Brief for Appellee 35 (citing Record 104–105, plaintiff's Exhibits 3, 4, 5).

[21] Under Texas law, either this Court or a United States court of appeals may certify a question of Texas criminal law "which may be determinative of the cause then pending and as to which it appears to the certifying court that there is no controlling precedent in the decisions of the Court of Criminal Appeals."   Tex. Rule App. Proc. 214.

availability of certification is not in itself sufficient to render abstention appropriate. *Id.*, at 151. It would be manifestly inappropriate to certify a question in a case where, as here, there is no uncertain question of state law whose resolution might affect the pending federal claim. As we have demonstrated, *supra*, at 468–469, this ordinance is neither ambiguous nor obviously susceptible of a limiting construction.[22] A federal court may not properly ask a state court if it would care in effect to rewrite a statute.[23] We therefore see no need in this case to abstain pending certification.

## IV

Today's decision reflects the constitutional requirement that, in the face of verbal challenges to police action, officers and municipalities must respond with restraint. We are

[22] JUSTICE POWELL argues that the unsettled question of the effect on this ordinance of § 6.02(b) of the Texas Penal Code, which requires "a culpable mental state" as an element of any offense, creates sufficient ambiguity to require certification. He suggests that the Texas Court of Criminal Appeals might limit convictions under the ordinance to cases in which there was a finding of "inten[t] to interfere with the officer's performance of his duties" justifies certification, and argues that such a limit would "narrow the focus of the constitutional question" before us. *Post*, at 474. As JUSTICE POWELL implicitly concedes, however, there is no possibility that such an intent requirement would eliminate the excessive discretion the ordinance affords to the police in choosing whom to arrest; even with such a requirement, the ordinance would remain unconstitutionally overbroad. Moreover, the meaning and application of such an intent requirement is not self-evident, and could raise independent questions of vagueness or of overbreadth. This is therefore a case where certification "would not only hold little hope of eliminating the issue of [overbreadth] but also would very likely pose other constitutional issues for decision, a result not serving the abstention- [or certification-]justifying end of avoiding constitutional adjudication." *Baggett* v. *Bullitt*, 377 U. S., at 378.

[23] It would also be inappropriate for a federal court to certify the entire constitutional challenge to the state court, of course, for certified questions should be confined to uncertain questions of state law. See 17 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4248, pp. 529–530 (1978).

mindful that the preservation of liberty depends in part upon the maintenance of social order. Cf. *Terminiello* v. *Chicago, supra,* at 37 (dissenting opinion). But the First Amendment recognizes, wisely we think, that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive. We therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion and its judgment except that I do not agree with any implication—if one exists—see *ante,* at 461–462, that *Gooding* v. *Wilson,* 405 U. S. 518 (1972), and *Lewis* v. *City of New Orleans,* 415 U. S. 130 (1974), are good law in the context of their facts, or that they lend any real support to the judgment under review in this case. I dissented in *Gooding* and *Lewis,* see 405 U. S., at 534, and 415 U. S., at 136, in the conviction that the legislation there under consideration was related to "fighting words," within the teaching and reach of *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). I am still of that view, and I therefore disassociate myself from any possible suggestion that those cases are controlling authority here. The Houston ordinance before us, however, as is evident from its very language, and as the Court demonstrates, *ante,* at 462–463, 465, is far more broad and more offensive to First Amendment values and is susceptible of regular application to protected expression.

JUSTICE SCALIA, concurring in the judgment.

For the reasons stated by JUSTICE POWELL in Part II of his opinion, I agree that abstention would not be appropriate in this case. Because I do not believe that the Houston ordinance is reasonably susceptible of a limiting construction that would avoid the constitutional question posed in this case, I agree with the Court that certification would also be inappropriate. On the merits, I agree with the views expressed by

JUSTICE POWELL in Part III of his opinion. I therefore concur in the judgment and joins Parts II and III of JUSTICE POWELL's opinion.

JUSTICE POWELL, with whom JUSTICE O'CONNOR joins, and with whom THE CHIEF JUSTICE joins as to Parts I and II, and JUSTICE SCALIA joins as to Parts II and III, concurring in the judgment in part and dissenting in part.

The city of Houston has made it unlawful "for any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty." Code of Ordinances, City of Houston, Texas § 34–11(a) (1984). The Court today concludes that this ordinance violates the First and Fourteenth Amendments of the Constitution. In my view, the Court should not have reached the merits of the constitutional claims, but instead should have certified a question to the Texas Court of Criminal Appeals. I also disagree with the Court's reasons for declining to abstain under the principle of *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941). Finally, although I agree that the ordinance as interpreted by the Court violates the Fourteenth Amendment, I write separately because I cannot join the Court's reasoning.

I

This case involves a challenge to an ordinance designed to prevent interference with police officers in the performance of their duties. Constitutional analysis should not proceed until we determine the precise meaning of the ordinance in question. But this problem does not detain the Court, because it concludes that interpretation of the ordinance presents "no uncertain question of state law." *Ante*, at 471. On the contrary, I think there is a serious question as to the meaning of the ordinance.

The challenged ordinance does not contain an explicit intent requirement. Both parties acknowledge, however, that the Texas Penal Code requires imputation of some culpability requirement. See Brief for Appellant 28–30; Brief for Ap-

pellee 31. Texas Penal Code Ann. § 6.02(b) (1974) provides: "If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element."[1] The nature of this imputed mental state has a direct effect on the constitutional issue presented by this case. The Court apparently assumes that the requisite intent can be provided by a person's intent to utter words that constitute an interruption. But it would be plausible for the Texas Court of Criminal Appeals to construe the intent requirement differently. For example, that court could conclude that conviction under the ordinance requires proof that the person not only intended to speak, but also intended to interfere with the officer's performance of his duties.

This interpretation would change the constitutional questions in two ways: it would narrow substantially the scope of the ordinance, and possibly resolve the overbreadth question; it also would make the language of the ordinance more precise, and possibly satisfy the concern as to vagueness. At the least, such an interpretation would narrow the focus of the constitutional question and obviate the need for the Court's broad statements regarding First Amendment protections of speech directed at police officers. It is not this Court's role, however, to place an interpretive gloss on the words the Houston City Council has chosen. The ordinance is not a federal law, and we do not have the power "'authoritatively to construe'" it. *Gooding* v. *Wilson*, 405 U. S. 518, 520 (1972) (quoting *United States* v. *Thirty-seven Photographs*, 402 U. S. 363, 369 (1971)).

But we are not without means of obtaining an authoritative construction. Last year the Texas voters amended the Texas Constitution to provide that the "court of criminal ap-

---

[1] At least one Texas appellate court has concluded that this section applies to municipal ordinances. See *Pollard* v. *State*, 687 S. W. 2d 373, 374 (Tex. App. 1985) (pet. ref'd, *Pollard* v. *State*, No. 05–83–01161 Cr. (Jan. 29, 1986)).

peals [has] jurisdiction to answer questions of state law certified from a federal appellate court." Tex. Const., Art. 5, §3–c. See Tex. Rule App. Proc. 214 (implementing this aspect of the constitutional provision). As JUSTICE O'CONNOR explained recently, "[s]peculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when . . . the state courts stand willing to address questions of state law on certification from a federal court." *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 510 (1985) (concurring). The Court repeatedly has emphasized the appropriateness of certification in cases presenting uncertain questions of state law. In such cases, certification can "'save time, energy, and resources and hel[p] build a cooperative judicial federalism.'" *Bellotti* v. *Baird*, 428 U. S. 132, 150–151 (1976) (quoting *Lehman Brothers* v. *Schein*, 416 U. S. 386, 391 (1974)).[2]

In my view, the ambiguity of the ordinance, coupled with the seriousness of invalidating a state law, requires that we ascertain what the ordinance means before we address appellee's constitutional claims. I therefore would vacate the judgment below and remand with instructions to certify the case to the Texas Court of Criminal Appeals to allow it to interpret the intent requirement of this ordinance. Accordingly, I dissent.

The Court concludes, however, that the case properly is before us, and so I address the remaining issues presented.[3]

---

[2] This case demonstrates two advantages of certification over the more traditional *Pullman* abstention procedure. First, certification saves time by sending the question directly to the court that is empowered to provide an authoritative construction of the statute. Second, certification obviates the procedural difficulties that may hinder efforts to obtain declaratory judgments from state trial courts. See *infra*, at 476–477.

[3] Cf. *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 374 (1962) (Harlan, J., dissenting in part and concurring in part); *Gillespie* v. *United States Steel Corp.*, 379 U. S. 148, 170 (1964) (Stewart, J., concurring). See also *Longshoremen* v. *Davis*, 476 U. S. 380, 403 (1986) (REHNQUIST, J., concurring in part and concurring in judgment).

## II

*Pullman* abstention generally is appropriate when determination of an unsettled question of state law by a state court could avoid the need for decision of a substantial question of federal constitutional law. Although I agree with the Court that *Pullman* abstention is inappropriate in this case, I write separately because my reasons are somewhat different from those expressed by the Court.[4]

*Pullman* abstention is inappropriate unless the state courts "provid[e] the parties with adequate means to adjudicate the controverted state law issue." Field, Abstention in Constitutional Cases: The Scope of the *Pullman* Abstention Doctrine, 122 U. Pa. L. Rev. 1071, 1144 (1974). See 17 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4242, p. 468 (1978). Cf. *Railroad Comm'n* v. *Pullman Co.*, 312 U. S., at 501 (abstaining because the "law of Texas appears to furnish easy and ample means for determin-

---

[4] The Court concludes that *Pullman* abstention is inappropriate for two reasons. First, it suggests that this Court should be "particularly reluctant to abstain in cases involving facial challenges based on the First Amendment." *Ante*, at 467. The Court supports this conclusion with a citation to *Dombrowski* v. *Pfister*, 380 U. S. 479 (1965). I see nothing in that case that supports such a broad principle. The *Dombrowski* Court declined to abstain because "the interpretation ultimately put on the [challenged state] statutes by the state courts is irrelevant," *id.*, at 490, and because "no readily apparent construction suggest[ed] itself as a vehicle" for curing the constitutional problem with the statute, *id.*, at 491. Both of these rationales are straightforward applications of the general rule that *Pullman* abstention is appropriate only when determination of an uncertain question of state law would obviate the need for the federal court to decide a substantial question of federal constitutional law.

The Court's second reason for not abstaining is that it believes the statute is not "'fairly subject to an interpretation which will . . . substantially modify the federal constitutional question.'" *Ante*, at 468 (quoting *Harman* v. *Forssenius*, 380 U. S. 528, 534–535 (1965)). See *supra*, at 473–474, for my disagreement with this view.

ing the Commission's authority").[5]   It is not clear that Texas law affords a remedy by which Hill could obtain a state court interpretation of the ordinance.   The only apparent means of securing such a ruling would be through an action for a declaratory judgment.   See Tex. Civ. Prac. & Rem. Code Ann. § 37.001 *et seq.* (1986) (authorizing courts to grant declaratory judgments).   But Texas law treats declaratory judgment actions as civil cases.   Thus, they are appealable to the Texas Supreme Court rather than the Texas Court of Criminal Appeals.   See, *e. g., United Services Life Ins. Co.* v. *Delaney,* 396 S. W. 2d 855 (Tex. 1965).   Moreover, because the Texas Court of Criminal Appeals has exclusive appellate jurisdiction to decide questions of Texas criminal law, see Tex. Const., Art. V, § 5, the Texas Supreme Court has held, with narrow exceptions, that injunctive or declaratory relief against criminal statutes is not available in civil cases.   See *Texas Liquor Control Board* v. *Canyon Creek Land Corp.,* 456 S. W. 2d 891, 894–896 (Tex. 1970).   Thus, it is quite unlikely that a declaratory or injunctive action would bring Hill any determination of the meaning of the ordinance—either from a trial or an appellate court.   In short, the only sure ways for the ordinance to be interpreted are by certification, see *supra,* at 473–475, and by appeals of criminal convictions under the ordinance.   Neither of these routes provides Hill a means to obtain relief sufficient to justify *Pullman* abstention.

Aside from the barriers created by Texas procedure, the late stage at which the city of Houston raised this issue weighs heavily against abstention.   Houston first suggested that abstention was appropriate after the Court of Appeals published its panel opinion invalidating the ordinance.   As

---

[5] I note that the adequacy of state procedures is examined much more strictly in cases seeking *Pullman* abstention than in cases seeking *Younger* abstention.   Compare, *e. g., Pennzoil Co.* v. *Texaco Inc.,* 481 U. S. 1, 14–17 (1987).

we have noted in a similar case, "[t]his proposal comes nearly three years after the filing of the complaint and would produce delay attributable to abstention that the Court in recent years has sought to minimize." See *Mayor of Philadelphia* v. *Education Equality League*, 415 U. S. 605, 628 (1974). In sum, the late presentation of this claim, coupled with the doubts as to whether relief could be secured under Texas law, convinces me that *Pullman* abstention is inappropriate here.

## III

I agree with the Court's conclusion that the ordinance violates the Fourteenth Amendment, but do not join the Court's reasoning.

### A

The Court finds that the ordinance "deals not with core criminal conduct, but with speech." *Ante,* at 460. This view of the ordinance draws a distinction where none exists. The terms of the ordinance—"oppose, molest, abuse or interrupt any policeman in the execution of his duty"—include general words that can apply as fully to conduct as to speech. It is in this respect that *Lewis* v. *City of New Orleans*, 415 U. S. 130 (1974), is clearly distinguishable. In that case the New Orleans ordinance made it a breach of the peace for:

> "'any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty.'" *Id.*, at 132 (quoting New Orleans Ordinance 828 M. C. S. § 49–7).

On its face, the New Orleans ordinance criminalizes only the use of language. JUSTICE BRENNAN, speaking for the Court in *Lewis*, explicitly noted this, stating that the ordinance "punishe[d] only spoken words." *Id.*, at 134. By contrast, the ordinance presented in this case could be applied to activity that involves no element of speech or communication. For example, the ordinance evidently would punish individ-

uals who—without saying a single word—obstructed an officer's access to the scene of an ongoing public disturbance, or indeed the scene of a crime. Accordingly, I cannot agree with the Court that this ordinance punishes only speech.

I do agree that the ordinance can be applied to speech in some cases. And I also agree that the First Amendment protects a good deal of speech that may be directed at police officers. On occasion this may include verbal criticism, but I question the implication of the Court's opinion that the First Amendment generally protects verbal "challenge[s] directed at police officers," *ante*, at 461. A "challenge" often takes the form of opposition or interruption of performance of duty.[6] In many situations, speech of this type directed at police officers will be functionally indistinguishable from conduct that the First Amendment clearly does not protect. For example, I have no doubt that a municipality constitutionally may punish an individual who chooses to stand near a police officer and persistently attempt to engage the officer in conversation while the officer is directing traffic at a busy intersection. Similarly, an individual, by contentious and abusive speech, could interrupt an officer's investigation of possible criminal conduct. A person observing an officer pursuing a person suspected of a felony could run beside him in a public street shouting at the officer. Similar tactics could interrupt a policeman lawfully attempting to interrogate persons believed to be witnesses to a crime.

---

[6] The first definition of "challenge" in the 1980 edition of the American Heritage Dictionary is "[a] call to engage in a contest or fight." The Court implies that municipalities can punish an attempt to interfere with police officers only if it "physically obstruct[s] the officer's investigation," *ante*, at 463, n. 11, or if it constitutes "fighting words" within the meaning of *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942), see *ante*, at 464, n. 12. This implication troubles me because, as I have indicated in the text *supra* this page, there can be many situations where a State—in the public interest—should have the right to punish speech directed at police officers that does not fall within either of these exceptions.

In sum, the Court's opinion appears to reflect a failure to apprehend that this ordinance—however it may be construed—is intended primarily to further the public's interest in law enforcement. To be sure, there is a fine line between legitimate criticism of police and the type of criticism that interferes with the very purpose of having police officers. But the Court unfortunately seems to ignore this fine line and to extend First Amendment protection to any type of verbal molestation or interruption of an officer in the performance of his duty.

## B

Despite the concerns expressed above, I nevertheless agree that the ambiguous terms of this ordinance "confe[r] on police a virtually unrestrained power to arrest and charge persons with a violation. . . . The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident." *Lewis* v. *City of New Orleans*, *supra*, at 135–136 (POWELL, J., concurring in result). No Texas court has placed a limiting construction on the ordinance. Also, it is clear that Houston has made no effort to curtail the wide discretion of police officers under the present ordinance. The record contains a sampling of complaints filed under the ordinance in 1981 and 1982. People have been charged with such crimes as "Failure to remain silent and stationary," "Remaining," "Refusing to remain silent," and "Talking." 789 F. 2d 1103, 1113–1114 (CA5 1986) (en banc). Although some of these incidents may have involved unprotected conduct, the vagueness of these charges suggests that, with respect to this ordinance, Houston officials have not been acting with proper sensitivity to the constitutional rights of their citizens. When government protects society's interests in a manner that restricts some speech the law must be framed more precisely than the ordinance before us. Accordingly, I agree with the Court that the Houston ordinance is unconstitutional.

It is difficult, of course, specifically to frame an ordinance that applies in

> "areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision. Control of the broad range of disorderly conduct that may inhibit a policeman in the performance of his official duties may be one such area, requiring as it does an on-the-spot assessment of the need to keep order." *Smith* v. *Goguen*, 415 U. S. 566, 581 (1974).

In view of the difficulty of drafting precise language that never restrains speech and yet serves the public interest, the attempts of States and municipalities to draft laws of this type should be accorded some leeway. I am convinced, however, that the Houston ordinance is too vague to comport with the First and Fourteenth Amendments. As I explained *supra*, at 473–474, it should be possible for the present ordinance to be reframed in a way that would limit the present broad discretion of officers and at the same time protect substantially the city's legitimate interests. For example, the ordinance could make clear that it applies to speech only if the purpose of the speech were to interfere with the performance by a police officer of his lawful duties. In this situation, the difficulties of drafting precisely should not justify upholding this ordinance.

## IV

Although I believe that the proper course is for the Court to vacate the judgment of the Court of Appeals, I "bo[w] to the Court's decision that the case is properly before us," *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 374 (1962) (Harlan, J., concurring in part and dissenting in part), and concur in the judgment of affirmance.

CHIEF JUSTICE REHNQUIST, dissenting.

I join Parts I and II of JUSTICE POWELL's opinion concurring in the judgment in part and dissenting in part. I do not

agree, however, that the Houston ordinance, in the absence of an authoritative construction by the Texas courts, is unconstitutional.   See *Lewis* v. *City of New Orleans*, 415 U. S. 130, 136 (1974) (BLACKMUN, J., dissenting).   I therefore dissent from the Court's affirmance of the judgment of the Court of Appeals.