van Gestel, J.
The defendant, Richard T. Meuse (“Meuse”), is charged, among other things, with three counts of tattooing while not being a registered physician, in violation of G.L.c. 265, sec. 34. Meuse, asserting the constitutional sanctity for the free expression of ideas and beliefs in a unique manner by an artist— presumably himself — and the wearers, his alleged victims, has moved to dismiss all three counts of the tattooing indictment as being facially deficient.
BACKGROUND
G.L. 265, sec. 34, as most recently amended by St. 1962, sec. 214, reads in its entirety:
Whoever, not being registered as a qualified physician under section two of chapter one hundred and twelve, or corresponding provisions of earlier laws, marks the body of any person by means of tattooing, shall be punished by a fine of not more than three hundred dollars or by imprisonment for not more than one year, or both.
Meuse’s indictment, using identical language in each of the three counts, charges that he, “while not being registered as a qualified physician under G.L. chapter 112, section 2, or corresponding provisions of earlier laws, did mark the body of [the victim] by means of tattooing” [sic].
Aside from where on the wearers’ bodies they appeared — the hands of two, and the left breasts of all three — what was depicted in Meuse’s artwork and whether the wearers desired or consented thereto[1] have not been reported to the Court. The Court has been advised, however, that the Salem Police were given by Meuse’s sister “a homemade electrical tattooing gun, professional tattooing ink and needles, iodine, alcohol, gloves and tattooing magazines.” (Commonwealth Affid. para. 15.) This equipment, Meuse’s sister told police, belonged to him. (Affid. para. 14.)
The outcome of this motion will turn solely on the Court’s facial examination of the statute. The constitutional protections provided by the First and Fourteenth Amendments to the United States Constitution and Art. XVI of the Massachusetts Declaration of Rights will chart the course.
DISCUSSION
The Court first must address the Commonwealth’s standing argument. It was asserted that only the wearer is making a constitutionally protected expression and, therefore, Meuse himself has no standing to challenge the statute. To this Court, that is like saying that it is the painting and its owner — not the artist, whose talents, brushes and paints, created the work— who is making the expression entitled to constitutional protection. That, however, is not the law. “A defendant being prosecuted for speech or expressive conduct may challenge the law on its face if it reaches protected expression, even when that person’s activities are not protected by the First Amendment.” R.A.V. v. St Paul, 505 U.S. 377, 411 (1992). Meuse has standing to present his motion to dismiss.
“In the First Amendment context, ‘[c]riminal statutes must be scrutinized with particular care; those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid if they also have legitimate application.’ ” Id. at 414, quoting Houston v. Hill, 482 U.S. 451, 459 (1987).
Like Commonwealth v. Oakes, 401 Mass. 602 (1988), this case involves both conduct and speech in the First Amendment sense, although there seems much more speech here than there was in Oakes. In any event, “First Amendment analysis does not sever conduct from speech. To do so would undercut the foundation of First Amendment protections.” Id. at 604.
The statute challenged by this motion makes it a criminal act for anyone except a qualified physician to mark the body of a person by means of tattooing. If tattooing is a protected form of expression, G.L.c. 265, sec. 34 as written cannot pass constitutional muster.
The statute does not include a definition of the word “tattooing. ” Further, this Court has found no definition of the word in any other place in the General Laws or, for that matter, in any decided Massachusetts case. Counsel have proffered nothing on this point either. Consequently, the Court must apply the customary rules of statutory construction. Commonwealth v. Richards, 426 Mass. 689, 690 (1998).
Judges must accord words their ordinary meaning, with due regard to a statute’s purpose. Pyle v. School Committee of South Hadley, 423 Mass. 283, 285-86 (1996). When the statute does not define terms, the Court must look to the plain meaning of the words used. Henry v. Board of Appeals of Dunstable, 418 Mass. 841, 843-45 (1994); Commonwealth v. One 1987 Mercury Cougar Auto., 413 Mass. 534, 537-38 (1992); Commonwealth v. Jackson, 37 Mass.App.Ct. 940, 941 (1994).
The Random House Dictionary of the English Language, Second Edition, Unabridged — 1987, defines *662 “tattooing” as “the act or practice of marking the skin with indelible patterns, pictures, legends, etc., by making punctures in it and inserting pigments.”
A 1998 Synopsis by Hoag Levins entitled “The Changing Cultural Status of Tattoo Art” (http:/www.tattooartist.com/history.html), is enlightening. It reads:
America’s core cultural reference books, professional journals, newspapers and magazines recognize tattooing as a well-established art form that, over the last three decades, has undergone dramatic changes. In the 1970s, artists trained in traditional fine art disciplines began to embrace tattooing and brought with them entirely new sorts of sophisticated imagery and technique. Advances in electric needle guns and pigments provided them with new ranges of color, delicacy of detail and aesthetic possibilities. The physical nature of many local tattooing establishments also changed as increasing numbers of operators adopted equipment and procedures resembling those of medical clinics — particularly in areas where tattooing is regulated by governmental health agencies.
The cultural status of tattooing has steadily evolved from that of an anti-social activity in the 1960s to that of a trendy fashion statement in the 1990s. First adopted and flaunted by influential rock stars like the Rolling Stones in the early 1970s, tattooing had, by the late 1980s become accepted by ever broader segments of mainstream society. Today, tattoos are routinely seen on rock stars, professional sports figures, ice skating champions, fashion models, movie stars and other public figures who play a significant role in setting the culture’s contemporary mores and behavior patterns.
During the last fifteen years, two distinct classes of tattoo business have emerged. The first is the “tattoo parlor” that glories in a sense of urban outlaw culture; advertises itself with garish exterior signage; offers “pictures-off-the-wall” assembly-line service; and often operates with less than optimum sanitary procedures.
The second is the “tattoo art studio” that most frequently features custom, fine art design; the ambiance of an upscale beauty salon; marketing campaigns aimed at middle-and upper-class professionals; and “by-appointment” services only. Today’s fine art tattoo studio draws the same kind of clientele as a custom jewelry store, fashion boutique, or high-end antique shop.
The market demographics for tattoo services are now skewed heavily toward mainstream customers. Tattooing today is the sixth-fastest growing retail business in the United States. The single fastest growing demographic group seeking tattoo services is, to the surprise of many, middle-class suburban women.
Tattooing is recognized by government agencies as both an art form and a profession and tattoo-related art work is the subject of museum, gallery and educational institution art shows across the United States.[2]
More recently, the Sunday, November 21, 1999, edition of The New York Times, on page 50 of the Arts & Leisure Section, advertised the current showing entitled “Body Art: Marks of Identity,” at the American Museum of Natural History in New York City. The accompanying photographs of the November 17, 1999 opening gala depicted several of the Manhattan glitterati decked out in their own fashion-statement tattoos.
Tattooing cannot be said to be other than one of the many kinds of expression so steadfastly protected by our Federal and State Constitutions. See, e.g., Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566 (1991); T&D Video, Inc. v. City of Revere, 423 Mass. 577, 580 (1996); Commonwealth v. Sees, 374 Mass. 532, 535-38 (1978); Commonwealth v. 707 Main Corp., 371 Mass. 374, 381-86 (1976); Highland Tap of Boston, Inc. v. City of Boston, 26 Mass.App.Ct. 239, 241 (1988).
It may be argued — although it was not here — that there is some ambiguity in G.L.c. 265, sec. 34. Ambiguity concerning the ambit of criminal statutes, however, must be resolved in favor of lenity. Commonwealth v. Maxim, 429 Mass. 287, 291-92 (1999). It is firmly a part of Massachusetts law that criminal statutes, when ambiguous, are to be strictly construed against the Commonwealth. Commonwealth v. Ruiz, 426 Mass. 391, 394 (1998); Commonwealth v. Wotan, 422 Mass. 740, 742-43 (1996).
In any event, a statute cannot impose more than an “incidental” restriction on free speech. Commonwealth v. Provost, 418 Mass. 416, 422-23 (1994). This is what has come to be known as the “overbreadth” doctrine. See, e.g., Marshfield Family Skateland, Inc. v. Marshfield, 389 Mass. 436, 444 (1983). “(I]f a statute’s deterrent effect on protected expression is not ‘both real and substantial’ and if the statute is ‘readily subject to a narrowing construction’ the doctrine of overbreadth may not be employed.” Id. at 444.
The effect of G.L.c. 265, sec. 34 is, however, both real and substantial in its prohibition of tattooing, and it is not subject to a narrowing construction. This Court predicts and assumes “that the statute’s very existence may cause others not before the Court to refrain from constitutionally protected speech or expression.” Marshfield, supra, at 444, quoting from Broadrick v. Oklahoma, 413 U.S. 601, 611-12 (1973).
The absolute prohibition of all forms of tattooing, a protected form of expression, except by licensed physicians — not themselves generally known to be tattoo artists — is substantial overbreadth. Id. at 445. See also Shad v. Borough of Mt. Ephraim, 452 U.S. 61, 66 (1981). G.L.c. 265, sec. 34 sweeps too broadly by punishing criminally a substantial amount of consti *663 tutionally protected expression. It is, therefore, unconstitutional and cannot form the basis for the tattooing indictment against the defendant here.
ORDER
For the reasons stated above, the defendant’s motion to dismiss the tattooing indictment against him is ALLOWED.

 Two of the victims are minors, which may raise issues regarding their legal ability to consent. The issue need not be discussed, however, given the outcome of this decision.

 For other references on the subject of tattooing as an art form, the Court notes: TATTOO, Encyclopedia Americana, Grolier Incorporated, Danbury, CT, 1993, vol. 30, pp. 312-13, and “TATTOO,” The Dictionary of Art, Macmillan Publishers, Ltd., New York 1996, vol. 30, p. 366.