852 F.2d 1332
 271 U.S.App.D.C. 365, 15 Media L. Rep. 1907
 ACTION FOR CHILDREN'S TELEVISION, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Monroe Communications Corporation, Media Central, Inc., et
al., American Civil Liberties Union Foundation, et
al., Intervenors.
 No. 88-1064.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 1, 1988.
Decided July 29, 1988.
As Amended July 29, 1988.
 
 Timothy B. Dyk, with whom Teresa D. Baer, Henry Geller, Donna Lampert, J. Laurent Scharff, Robert J. Aamoth, Rainer K. Kraus, Steven A. Lerman, Dennis P. Corbett, Laura B. Humphries, Michael R. Klipper, Jan G. Levine, Henry L. Baumann, Steven A. Bookshester, Howard Monderer, Molly Pauker, Lois Schiffer, Karen Christensen, Arthur B. Goodkind, Andrew Jay Schwartzman, Jonathan D. Blake, Janet E. Milne, Paula A. Jameson, Nancy H. Hendry, Jane E. Kirtley, and Henry S. Hoberman, Washington, D.C., were on the brief for petitioners. Mary C. Lyons, Washington, D.C., also entered an appearance for petitioners.
 Diane S. Killory, General Counsel, F.C.C., with whom Daniel M. Armstrong, Associate Gen. Counsel, Sue Ann Preskill, Counsel, F.C.C., Catherine G. O'Sullivan and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.
 
 
 1
 C. Edwin Baker, John A. Powell, Paul L. Hoffman, Los Angeles, Cal., Edward de Grazia, New York City, and Ira M. Lowe, Washington, D.C., were on the joint brief of intervenors, American Civil Liberties Union Foundation, and National Federation of Community Broadcasters and amici curiae Pen American Center and Allen Ginsberg.
 
 
 2
 Harry F. Cole, Washington, D.C., was on the brief for intervenor Monroe Communications Corp.
 
 
 3
 Bruce A. Taylor was on the brief for amici curiae, Morality in Media, Inc. and Citizens for Decency Through Law, Inc.
 
 
 4
 Tom W. Davidson and Margaret L. Tobey, Washington, D.C., entered appearances for intervenor Media Central, Inc., et al.
 
 
 5
 Before ROBINSON, RUTH BADER GINSBURG, and SENTELLE, Circuit Judges.
 
 
 6
 Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.
 
 RUTH BADER GINSBURG, Circuit Judge:
 
 7
 In these three cases, the Federal Communications Commission (FCC or Commission) readdressed the subject, earlier aired in FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (Pacifica ), of indecent language in radio broadcasts. The Commission decided that the enforcement standard it had employed from 1975 until 1987 was unduly narrow. It therefore declared in these cases a changed standard, one concededly more difficult to administer.[1]
 
 
 8
 We uphold the generic definition the FCC has determined to apply, case-by-case, in judging indecency complaints, but we conclude that the Commission has not adequately justified its new, more restrictive channeling approach, i.e., its curtailment of the hours when nonobscene programs containing indecent speech may be broadcast. Two of the three cases before us involve programs aired after 10:00 p.m. One involves a show aired 6:00-10:00 a.m. Observing that the FCC, mindful of the licensee's reliance on prior Commission rulings, imposed no sanctions, we affirm the Commission's declaratory warning order regarding the show aired 6:00-10:00 a.m. We vacate the FCC's orders regarding the post 10:00 p.m. broadcasts and remand those cases to the Commission with instructions to reopen the time limitation or channeling aspect of the rulings for fresh decision on a full record and in a manner sensitive to these considerations: (1) the speech at issue, as the FCC has acknowledged, is protected by the first amendment; (2) the Commission's avowed objective is not to establish itself as censor but to assist parents in controlling the material young children will hear.
 
 I.
 
 9
 Petitioners in this case are commercial broadcasting networks, public broadcasting entities, licensed broadcasters, associations of broadcasters and journalists, program suppliers, and public interest groups; they seek review of a December 1987 FCC order which affirmed, on reconsideration, three April 1987 rulings,[2] and announced a new gauge for administering the restraint, imposed by 18 U.S.C. Sec. 1464 (1982),[3] on the use of indecent language in radio communications. The Commission also warned broadcasters that "10:00 p.m. can no longer be considered the hour after which indecent programming may be aired"; instead, 12:00 midnight is the FCC's "current thinking" on "a reasonable delineation point." In re Infinity Broadcasting Corp. of Pennsylvania, 64 Rad.Reg.2d (P & F) 211, 219 n. 47 (1987) (Reconsideration Order ).
 
 
 10
 Petitioners maintain that the FCC's broadened indecency enforcement standard is facially invalid because unconstitutionally vague. Intervenors American Civil Liberties Union Foundation (ACLU), et al. present a second facial challenge: the FCC's mode of stamping material indecent, they contend, is substantially overbroad. Petitioners also urge that the Commission's action is arbitrary and capricious because the change in regulatory course was not accompanied by the requisite "reasoned analysis."
 
 
 11
 Adhering to the view that broadcast material that is indecent but not obscene may be channeled to certain times of day, but not proscribed entirely,[4] the FCC indicated in its Reconsideration Order that 12:00 midnight to 6:00 a.m. would be "safe harbor" hours for such material. 64 Rad.Reg.2d at 217, 219 n. 47. Petitioners, joined by intervenors ACLU et al., contend that this time restraint, stretching to all but the hours most listeners are asleep, lacks record support and, in violation of the first amendment, effectively denies adults access to constitutionally-protected material.
 
 
 12
 We hold that the FCC adequately explained why it decided to change its enforcement standard. Consideration of petitioners' vagueness challenge, we conclude, is not open to lower courts, in view of the Supreme Court's 1978 Pacifica decision. Intervenors' overbreadth plea, we rule, is not effective argument to the extent that it attacks the FCC's generic definition of indecent material.
 
 
 13
 We further hold, however, that the FCC failed to adduce evidence or cause, particularly in view of the first amendment interest involved, sufficient to support its hours restraint; consequently, we vacate two of the FCC's declaratory orders and remand for reconsideration of the times at which programs containing indecent material may be broadcast.
 
 II.
 
 14
 In 1978, in Pacifica, the Supreme Court upheld the FCC's authority to regulate a radio broadcast that is indecent but not obscene. The Court ruled that 47 U.S.C. Sec. 326 (1982), which forbids FCC "censorship," does not deny the Commission power "to impose sanctions on licensees who engage in obscene, indecent, or profane broadcasting." 438 U.S. at 738, 98 S.Ct. at 3034. The Court concluded that the specific broadcast material in question in Pacifica --a recording of a George Carlin monologue titled "Filthy Words"--was indecent within the meaning of section 1464. In so ruling, the court rejected the broadcaster's objection that the definition of indecent material must include the element of prurient appeal. Id. at 741, 98 S.Ct. at 3036. On narrow grounds, the Court held that the FCC order under review in Pacifica did not transgress constitutional limits; the first amendment, according to the Court, did not proscribe the Commission's case-specific determination that the Carlin monologue was subject to regulation because his performance, captured on a record, was "indecent as broadcast." Id. at 734, 750, 98 S.Ct. at 3032, 3040.
 
 
 15
 In the Commission's 1975 Pacifica order, 56 F.C.C.2d 94 (1975), the FCC stated that "to avoid the error of overbreadth," it was important to be "explicit" about "whom we are protecting and from what"; the Commission then advanced this definition of "the concept of 'indecent' " in relation to broadcast material: "exposure of children to language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs." Id. at 98 (also reiterating that regulation is in order only "at times of the day when there is a reasonable risk that children may be in the audience"). At the start of its 1975 opinion, the FCC had announced: "We review the applicable legal principles and clarify the standards which will be utilized in considering the public's complaints about the broadcast of 'indecent' language." Id. at 94. On reconsideration, 59 F.C.C.2d 892 (1976), however, the Commission retrenched and stressed that its Pacifica ruling was made "in a specific factual context"; the Commission therefore declined to "comment on the various hypothetical situations posed by [petitioner Radio Television News Directors Association]." Id. at 893.
 
 
 16
 Following the Supreme Court's narrow affirmance of the Commission's 1975 Pacifica order, see 438 U.S. at 750, 98 S.Ct. at 3040, the FCC consistently reported that it would not essay expansive interpretation of the indecency concept. See, e.g., In re Application of WGBH Educ. Found., 69 F.C.C.2d 1250, 1254 (1978):
 
 
 17
 [Pacifica ] affords this Commission no general prerogative to intervene in any case where words similar or identical to those in Pacifica are broadcast over a licensed radio or television station. We intend strictly to observe the narrowness of the Pacifica holding. In this regard, the Commission's opinion, as approved by the Court, relied in part on the repetitive occurrence of the "indecent" words in question.
 
 
 18
 Repetitious use of Carlin's "seven dirty words" effectively became the FCC's yardstick for "indecency," and broadcasts after 10:00 p.m. were deemed not actionable. See Brief for Respondents at 7. No broadcasts were in fact found actionable after 1975, until the instant rulings. Reconsideration Order, 64 Rad.Reg.2d at 214 para. 4.
 
 
 19
 On April 29, 1987 the Commission released three decisions, each of which declared "indecent" material which would not have been so identified under the prior FCC standard; two of the broadcasts had aired after 10:00 p.m. In re Infinity Broadcasting Corp. of Pennsylvania, 2 FCC Rcd 2705 (1987) (Infinity ); In re Pacifica Foundation, Inc., 2 FCC Rcd 2698 (1987) (Pacifica Foundation ); In re Regents of the University of California, 2 FCC Rcd 2703 (1987) (Regents of U.C.). In the Infinity case, the FCC held actionable portions of the Howard Stern talk show, which airs from 6:00 to 10:00 a.m. Monday through Friday; in Pacifica Foundation, the Commission made a similar ruling regarding excerpts of a play titled "Jerker," broadcast between 10:00 and 11:00 p.m. on a Sunday evening; in Regents of U.C., the FCC held actionable the broadcast of the song "Makin' Bacon" on a Saturday after 10:00 p.m.
 
 
 20
 Together with its decision in the Infinity, Pacifica Foundation, and Regents of U.C. cases, the FCC issued on April 29, 1987, a Public Notice summarizing the three orders released that day and "put[ting] all broadcast and amateur radio licensees on notice as to new standards that the Commission will apply in enforcing the prohibition against obscene and indecent transmissions." New Indecency Enforcement Standards to be Applied to All Broadcast and Amateur Radio Licensees, 62 Rad.Reg.2d (P & F) 1218 (1987). The Commission received multiple petitions for reconsideration and clarification. In response, the FCC issued a single reconsideration order in which it affirmed the three individual rulings, addressed comments and questions it had received, and elaborated on the rationale for the change in policy. Reconsideration Order, 64 Rad.Reg.2d 211. Petitioners now seek review of the reconsideration order.
 
 III.
 
 21
 As a threshold matter, the FCC contends that this court should follow the model set by the High Court in Pacifica, 438 U.S. at 734-35, 98 S.Ct. at 3032-33, and accordingly review nothing more than the three specific FCC holdings declaring material "indecent as broadcast." See Brief for Respondents at 28-29.[5] The Commission thus would have us consider only the questions whether, in each case, the broadcast material was indecent, id., and if it was, then whether the indecent material was aired at a time when there was a reasonable risk that children may have been in the audience. Id. at 42. The agency action we confront, however, appears to us sufficiently distinct from that involved in Pacifica as to warrant a different judicial response.
 
 
 22
 The Pacifica Court had before it a single, narrowly focused agency order. Though the FCC had articulated a generic definition of indecency, see supra p. 1335, the Commission also noted that "the number of words which fall within the definition of indecent is clearly limited." 56 F.C.C.2d at 99-100. On reconsideration, the Commission declined to respond to a request that it apply the generic definition to news and public affairs programming. 59 F.C.C.2d at 892-93. In its brief to the Supreme Court the FCC emphasized the narrowness of its ruling. Quoting extensively from Judge Leventhal's dissent in the Court of Appeals, Pacifica Foundation v. FCC, 556 F.2d 9, 30-37 (D.C.Cir.1977), the FCC stressed that its ruling carried with it the limiting conditions of certain words repeated over and over, and the early afternoon timing of the Carlin broadcast. Brief for the Federal Communications Commission at 41-43, Pacifica (No. 77-528). The Commission also directed the Court's attention to a then-pending legislative proposal advanced by the FCC which featured a safe harbor for the airing of indecent material. Id. at 43 n. 31; see Legislative Proposal, 122 CONG.REC. 33,359, 33,364 (1976) (safe harbor from 11:00 p.m. to 7:00 a.m.). The Supreme Court concluded that the FCC's decision concerning the Carlin monologue should be treated strictly as an ad hoc ruling. Pacifica, 438 U.S. at 734, 98 S.Ct. at 3032.
 
 
 23
 In contrast, in the present cases the FCC has left no doubt that it has stated a standard it expects to apply generally, not a prescription peculiarly fitted to the three individual broadcasts. See Reconsideration Order, 64 Rad.Reg.2d at 214 para. 5, 216 para. 15 ("Broadcasters, when judging whether certain material is legally indecent, ... must apply a generic definition with reference to the guidance provided by existing case law on the matter."). The Commission, indeed, suggested no theme or principle uniting the three disparate cases other than the generic definition itself.
 
 
 24
 The FCC's current procedural course differs notably from the route the Commission followed in the first Pacifica case. The three individual rulings here were accompanied by a Public Notice alerting all broadcasters to the new, generic standard by which broadcasts would be judged. 62 Rad.Reg.2d at 1218-19.[6] The bulk of the FCC's Reconsideration Order was devoted to the comments and concerns of parties not directly affected by the three individual rulings; the latter were treated summarily. 64 Rad.Reg.2d at 217-18 paras. 18-23. The Reconsideration Order reads more nearly like the result of a notice-and-comment rulemaking than of an ad hoc adjudicatory proceeding.[7]
 
 
 25
 We conclude that the agency has employed the informal adjudication format to promulgate a rule of general applicability. Certainly the FCC may choose the mode by which it proceeds. SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947). However, the agency may not resort to adjudication as a means of insulating a generic standard from judicial review. We therefore address petitioners' and intervenors' challenges to the FCC's generic definition of indecency and the specification of the times at which indecent material may be broadcast.
 
 IV.
 
 26
 The FCC acknowledges a change of regulatory course: The Commission now measures broadcast material against the generic definition of indecency, while formerly "no action was taken unless material involved the repeated use, for shock value, of words similar or identical to those satirized in the Carlin 'Filthy Words' monologue." Reconsideration Order, 64 Rad.Reg.2d at 213 para. 4. Petitioners charge that the Commission has failed to supply an adequate explanation for the change. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); Action for Children's Television v. FCC, 821 F.2d 741, 745 (D.C.Cir.1987). Specifically, petitioners say that the Commission, directly after Pacifica, had tailored the standard to make it reasonably certain and to afford broadcasters ample breathing space. Brief of Petitioners at 39. The new standard, they contend, is "inherently vague" and was installed without any evidence of a problem justifying a thickened regulatory response. Id.
 
 
 27
 The explanation offered by the Commission, in its Reconsideration Order, is that it found the deliberately-repeated-use-of-dirty-words policy "unduly narrow as a matter of law" and inconsistent with its obligation responsibly to enforce section 1464. 64 Rad.Reg.2d at 214 para. 5. The former approach permitted the unregulated broadcast of any material that did not contain Carlin's "filthy words," no matter how the material might affect children exposed to it. It made no legal or policy sense, the FCC said, to regulate the Carlin monologue but not "material that portrayed sexual or excretory activities or organs in as patently offensive a manner ... simply because it avoided certain words." Id.
 
 
 28
 We find the FCC's explanation adequate. Short of the thesis that only the seven dirty words are properly designated indecent--an argument petitioners disavow--some more expansive definition must be attempted. The FCC rationally determined that its former policy could yield anomalous, even arbitrary, results. No reasonable formulation tighter than the one the Commission has announced has been suggested in this review proceeding. The difficulty, or "abiding discomfort," we conclude, is not the absence of "reasoned analysis" on the Commission's part, but the "[v]agueness ... inherent in the subject matter." Pacifica Foundation v. FCC, 556 F.2d at 35 (Leventhal, J., dissenting). We turn next to that issue.
 
 V.
 
 29
 Petitioners charge that the term "indecent" is inherently unclear, and that the FCC's generic definition of indecency adds nothing significant in the way of clarification. The Commission's definition, petitioners therefore contend, provides broadcasters no meaningful guide identifying the category of material subject to regulation; accordingly, petitioners urge, the definition should be ruled unconstitutionally vague. In our view the Supreme Court's disposition of Pacifica stops "what the Constitution calls an 'inferior court' " from addressing this question on the merits. Cf. Pacifica Foundation v. FCC, 556 F.2d at 37 (Leventhal, J., dissenting) (referring to duty of "inferior court" to apply Supreme Court decisions endeavoring "to resolve the 'intractable' question of obscenity").
 
 
 30
 The generic definition of indecency now employed by the FCC is virtually the same definition the Commission articulated in the order reviewed by the Supreme Court in the Pacifica case.[8] However, the Court did not address, specifically, whether the FCC's definition was on its face unconstitutionally vague.[9] The Court did hold the Carlin monologue indecent within the meaning of section 1464. 438 U.S. at 741, 98 S.Ct. at 3036. We infer from this holding that the Court did not regard the term "indecent" as so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The Court referred to the "normal definition of 'indecent,' " quoted a dictionary definition, and noted that the Commission's definition uses "indecency" to indicate "patent offensiveness." 438 U.S. at 740 & nn. 14, 15, 98 S.Ct. at 3035-36 & nn. 14, 15.
 
 
 31
 Moreover, while observing that the Pacifica Foundation took issue with the FCC's definition of indecency, the Court quoted elements of the definition with seeming approval: "The Commission identified several words that referred to excretory or sexual activities or organs, stated that the repetitive, deliberate use of those words in an afternoon broadcast when children are in the audience was patently offensive, and held that the broadcast was indecent." 438 U.S. at 739, 98 S.Ct. at 3035. The Court ultimately declared: "When [Pacifica's] construction [that prurient appeal is an essential component of indecent language] is put to one side, there is no basis for disagreeing with the Commission's conclusion that indecent language was used in this broadcast." Id. at 741, 98 S.Ct. at 3036. In sum, if acceptance of the FCC's generic definition of "indecent" as capable of surviving a vagueness challenge is not implicit in Pacifica, we have misunderstood Higher Authority and welcome correction.
 
 VI.
 
 32
 Intervenors ACLU et al. argue that the FCC's generic definition of indecency is substantially overbroad. As we read Pacifica, only two members of the five-member majority thought it in order to rule on overbreadth,[10] so we proceed to address that issue on the merits. The ACLU's challenge is predicated on the absence of redemption from indecency status for material that has "serious merit." We hold that "serious merit" need not, in every instance, immunize indecent material from FCC channeling authority.
 
 
 33
 Statutes or regulations "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." City of Houston v. Hill, --- U.S. ----, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987). According to intervenors, a proper definition of indecency would include the requirement that the "work, taken as a whole, lacks serious literary, artistic, political, or scientific value." Brief of Intervenors ACLU et al. at 30 (quoting from Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973)). Observing that social value entitles otherwise unprotected obscene expression to first amendment protection, the ACLU contends that "it must also be true that social importance requires full protection for otherwise merely 'indecent' expression." Brief of Intervenors ACLU et al. at 31.
 
 
 34
 The Commission urges that its position is "not all that far apart" from the ACLU's on this issue. Brief for Respondents at 38. The FCC recognizes "serious merit" as "a relevant factor in determining whether material is patently offensive"; taking into account the aim of broadcast indecency regulation to protect children, and the channeling solution at stake, however, the FCC has "reject[ed] an approach that would hold that if a work has merit, it is per se not indecent." Reconsideration Order, 64 Rad.Reg.2d at 216-17 para. 17.
 
 
 35
 Indecent but not obscene material, we reiterate, qualifies for first amendment protection whether or not it has serious merit.[11] Children's access to indecent material, however, may be regulated, because "even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults....' " Ginsberg v. New York, 390 U.S. 629, 638, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968) (quoting Prince v. Massachusetts, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944)). Channeling is designed to protect unsupervised children.[12] See infra pp. 1343-1344. Some material that has significant social value may contain language and descriptions as offensive, from the perspective of parental control over children's exposure, as material lacking such value.[13] Since the overall value of a work will not necessarily alter the impact of certain words or phrases on children, the FCC's approach is permissible under controlling case law: merit is properly treated as a factor in determining whether material is patently offensive, but it does not render such material per se not indecent. See Reconsideration Order, 64 Rad.Reg.2d at 216-17 para. 17. The FCC's definition, therefore, is not vulnerable to the charge that it is substantially overbroad.[14]
 
 VII.
 
 36
 We have upheld the FCC's generic definition of indecency in light of the sole purpose of that definition: to permit the channeling of indecent material, in order to shelter children from exposure to words and phrases their parents regard as inappropriate for them to hear. See Reconsideration Order, 64 Rad.Reg. at 213 para. 2. Petitioners press two linked objections to the FCC's "current thinking" that 12:00 midnight is the hour after which indecent material may be broadcast without sanctions.[15] The FCC's channeling decision is arbitrary and capricious, petitioners contend, because it is not based on an adequate factual or analytic foundation. State Farm, 463 U.S. at 43, 103 S.Ct. at 2867. Tied to and coloring that contention, petitioners charge that the Commission's action regarding channeling violates the first amendment because it reduces adults to seeing and hearing material fit only for children. See Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957).
 
 
 37
 We agree that, in view of the curtailment of broadcaster freedom and adult listener choice that channeling entails, the Commission failed to consider fairly and fully what time lines should be drawn. We therefore vacate, in the Pacifica Foundation and Regents of U.C. cases, the FCC's ruling that the broadcast under review was actionable, and we remand those cases to the agency for thoroughgoing reconsideration of the times at which indecent material may be aired.
 
 
 38
 We are impelled by the Supreme Court's Pacifica decision, however, to affirm the declaratory ruling in Infinity. The FCC in that case held actionable portions of a talk show that airs 6:00-10:00 a.m. Monday through Friday. In Pacifica, the Court affirmed a similar declaratory order regarding material broadcast 2:00 p.m. on a Tuesday. No principle has been suggested to us under which we might rationally command different treatment of the Infinity early morning program and the Pacifica early afternoon broadcast, viewing those broadcasts in the context of the parent-child concerns underpinning the FCC's indecent speech regulation. Having upheld the Commission's standard for "indecent material," we conclude that the FCC's adjudication in Infinity must remain in place just as the Supreme Court ordered with respect to the Commission's adjudication in Pacifica. The FCC itself, however, would be acting with utmost fidelity to the first amendment were it to reexamine, and invite comment on, its daytime, as well as evening, channeling prescriptions. Cf. infra note 21.
 
 
 39
 Each of the April 29, 1987 rulings reported an FCC finding that the broadcast occurred at a time of day when there was a reasonable risk that children may have been in the audience. In Pacifica Foundation, involving a 10:00-11:00 p.m. broadcast, the Commission relied on ratings data indicating that "approximately 112,200 children aged 12-17 are in the Los Angeles metro survey area radio audience per average quarter hour between 7 p.m. and midnight on Sunday night." 2 FCC Rcd at 2699. In Regents of U.C., involving a program aired after 10:00 p.m., available data indicated that
 
 
 40
 approximately 1,200 children between 12 and 17 years of age are still in the radio audience per average quarter hour in the Santa Barbara area between 7 p.m. and midnight on Saturday evenings. There are approximately 4,900 children within this age group within the City of Santa Barbara itself and 27,800 in the county.
 
 
 41
 2 FCC Rcd at 2704 n. 10.
 
 
 42
 Even were we to treat each of the two rulings solely as an ad hoc adjudication, we would regard the evidence on which the Commission rested its channeling decisions as insubstantial, and its findings more ritual than real. It is familiar law that an agency treads an arbitrary course when it fails to "articulate any rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962); see also Independent U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908, 922 (D.C.Cir.1982) (applying same standard to informal adjudication). We conclude that the Commission followed such a course here.
 
 
 43
 In each instance under inspection the cited population figures appear to estimate the number of teens in the total radio audience. There is no indication of the size of the predicted audience for the specific radio stations in question. Cf. Reconsideration Order, 64 Rad.Reg.2d at 217 para. 18.
 
 
 44
 More troubling, the FCC ventures no explanation why it takes teens aged 12-17 to be the relevant age group for channeling purposes.[16] In the Commission's 1976 legislative proposal, cited to the Supreme Court in the FCC's Pacifica brief, the Commission would have required broadcasters to minimize the risk of exposing to indecent material children under age 12. The FCC reasoned: "Age 12 was selected since it is the accepted upper limit for children's programming in the industry and at the Commission. The Commission considered using the generally recognized age of majority--18--but concluded that it would be virtually impossible for a broadcaster to minimize the risk of exposure to 18-year-olds." 122 CONG.REC. at 33,367 n. 119. The FCC further referred to the distinction between obscene and merely indecent material in observing that "a reduced age seemed in order." Id. We cannot tell from the record before us whether the Commission is now spreading the focus of its concern to children over 12. See Brief for Respondents at 44 n. 46. If it is thus widening its sights, that apparent change in policy warrants explanation. If, on the other hand, the FCC continues to consider children under 12 as the age group of concern, it should either supply information on the listening habits of children in that age range, or explain how it extrapolates relevant data for that population from the available ratings information.
 
 
 45
 Furthermore, we note that in the Los Angeles case there is no basis for comparison between the number of teens estimated to be in the radio audience and the total number of teens in the listening area. In Santa Barbara, for which comparative data are available, the figure attracting the FCC's concern amounts to, at most, 4.3 percent of the age group population.[17] The Commission published no reason why it determined that the potential exposure of four percent of all children amounts to a "reasonable risk" for channeling purposes.
 
 
 46
 We do not, however, remand solely for reconsideration of the individual rulings. In the Reconsideration Order the FCC offered some advice to broadcasters:
 
 
 47
 [W]hereas previously we indicated that 10:00 p.m. was a reasonable delineation point, we now indicate that 12:00 midnight is our current thinking as to when it is reasonable to expect that it is late enough to ensure that the risk of children in the audience is minimized and to rely on parents to exercise increased supervision over whatever children remain in the viewing and listening audience.
 
 
 48
 64 Rad.Reg.2d at 219 n. 47. The Commission next listed several competing interests, see infra p. 1343, and said that its approach accommodated them. As noted by Commissioner Dennis, however, "the arguments the majority gives in support of midnight as the critical hour may well be equally true if applied to an earlier hour." Id. at 220 (Dennis, Comm'r, concurring). We agree that the FCC's midnight advice, indeed its entire position on channeling, was not adequately thought through.
 
 
 49
 At oral argument of this case on June 1, 1988, General Counsel for the FCC suggested that if this court found the midnight safe harbor problematic, we could disregard it and permit the Commission to make future channeling decisions on a case-by-case basis. However, the FCC itself has recognized that "the effect of that approach may well be to cause broadcasters to forego the broadcast of certain protected speech altogether, rather than to channel it to late night hours." Id. at 219 n. 47. In common with the Commission, we are constrained to agree with that assessment. Facing the uncertainty generated by a less than precise definition of indecency plus the lack of a safe harbor for the broadcast of (possibly) indecent material, broadcasters surely would be more likely to avoid such programming altogether than would be the case were one area of uncertainty eliminated. We conclude that, in view of the constitutionally protected expression interests at stake, the FCC must afford broadcasters clear notice of reasonably determined times at which indecent material safely may be aired.[18]
 
 
 50
 It is not within our authority to instruct the FCC to establish a safe harbor by means of a rulemaking proceeding. See Chenery, 332 U.S. at 203, 67 S.Ct. at 1581. We call attention, however, to the clear statement made by one Commissioner: "The fact is the Commission has no scientific body of information that conclusively establishes one time as more appropriate than another as the critical hour after which to permit broadcast of indecent speech. What is necessary is a notice of proposed rulemaking to establish a record." Reconsideration Order, 64 Rad.Reg.2d at 220 (Dennis, Comm'r, concurring). The inadequate record relevant to channeling made in the cases the Commission adjudicated lends support to that Commissioner's view.
 
 
 51
 The FCC noted that a channeling decision must accommodate these competing interests:
 
 
 52
 (1) the government, which has a compelling interest in protecting children from indecent material; (2) parents, who are entitled to decide whether their children are exposed to such material if it is aired; (3) broadcasters, who are entitled to air such material at times of day when there is not a reasonable risk that children may be in the audience; and (4) adult listeners, who have a right to see and hear programming that is inappropriate for children but not obscene.
 
 
 53
 Id. at 219 n. 47. At the June 1, 1988 oral argument, the FCC's General Counsel, in response to the court's inquiry, clarified the government's interest: it is the interest in protecting unsupervised children from exposure to indecent material; the government does not propose to act in loco parentis to deny children's access contrary to parents' wishes.[19] Therefore the first two interests identified by the FCC coalesce; the government's role is to facilitate parental supervision of children's listening. "[T]he Commission is advancing the government interest in safeguarding children from patently offensive [material], so as to enable parents to decide effectively what material of this kind their children will see or hear." Id. at 215 para. 11.[20] Thus, the FCC must endeavor to determine what channeling rule will most effectively promote parental--as distinguished from government--control.[21]
 
 
 54
 A securely-grounded channeling rule would give effect to the government's interest in promoting parental supervision of children's listening, without intruding excessively upon the licensee's range of discretion or the fare available for mature audiences and even children whose parents do not wish them sheltered from indecent speech. Such a rule would present a clearly-stated position enabling broadcasters to comprehend what is expected of them and to conform their conduct to the legal requirement.
 
 CONCLUSION
 
 55
 Broadcast material that is indecent but not obscene is protected by the first amendment; the FCC may regulate such material only with due respect for the high value our Constitution places on freedom and choice in what the people say and hear. We have concluded that, under governing precedent, the FCC's definition of indecent broadcast material, though vagueness is inherent in it, is not constitutionally defective, and that the Commission's declaratory order in Infinity, 2 FCC Rcd 2705, must be affirmed. But we have also found that the FCC has not implemented its authority to channel such material in a reasonable manner. We therefore vacate in part the reconsideration order under review and return Pacifica Foundation, 2 FCC Rcd 2698, and Regents of U.C., 2 FCC Rcd 2703, to the Commission for redetermination, after a full and fair hearing, of the times at which indecent material may be broadcast.
 
 
 56
 It is so ordered.
 
 
 
 [1]
 In re Infinity Broadcasting Corp. of Pennsylvania, 64 Rad.Reg.2d (P & F) 211 (1987) (Reconsideration Order )
 
 
 [2]
 In re Infinity Broadcasting Corp. of Pennsylvania, 2 FCC Rcd 2705 (1987) (Infinity); In re Pacifica Foundation, Inc., 2 FCC Rcd 2698 (1987) (Pacifica Foundation ); In re Regents of the University of California, 2 FCC Rcd 2703 (1987) (Regents of U.C.)
 
 
 [3]
 Section 1464 reads:
 Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both.
 
 
 [4]
 The Commission thus rejected the argument pressed by Morality in Media (MIM), and repeated by MIM here as amicus curiae; MIM urged that all indecent material (defined more broadly than the FCC has allowed) should be proscribed, because that is what the statute mandates
 
 
 [5]
 Intervenor Monroe Communications Corporation advances a related argument, suggesting that review of the FCC's generic definition of indecency is inconsistent with the Pacifica Court's recognition that "context" is "all-important" in determining whether a particular transmission is indecent. Brief of Intervenor Monroe Communications Corp. at 6 (quoting FCC v. Pacifica Foundation, 438 U.S. 726, 750, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978)). That consideration cannot preclude facial challenges to the FCC's generic definition where, as here, the Commission has plainly stated its intention to apply the definition in a variety of factual "contexts." See infra p. 1337
 
 
 [6]
 We do not decide whether, as petitioners contend, the Public Notice is independently reviewable. See Reply Brief of Petitioners at 3. The FCC's generic definition of indecency is adequately presented for review in the Reconsideration Order. See infra pp. 1337-38
 
 
 [7]
 The court "reviews not the label but the agency pronouncement that underlies the label," and "it is that pronouncement itself that governs the determination of its status." Office of Communication of the United Church of Christ v. FCC, 826 F.2d 101, 105 (D.C.Cir.1987)
 
 
 [8]
 In 1975 the Commission included in its definition of indecent material the element that material be broadcast "at times of the day when there is a reasonable risk that children may be in the audience." In re Pacifica Foundation, 56 F.C.C.2d 94, 98 (1975). The Commission now treats the nature of the material involved and the time of day when it is broadcast separately; the time of a broadcast is pertinent to whether it is actionable, not whether it is indecent. Nevertheless, a violation of section 1464 must be predicated on the same components relevant under the 1975 formulation: whether material is indecent and whether it was broadcast when there was a reasonable risk of children in the audience. Reconsideration Order, 64 Rad.Reg.2d at 213 n. 6
 
 
 [9]
 The argument that the term "indecent" in section 1464 is unconstitutionally vague (if not synonymous with "obscene") was made to the Supreme Court in the Pacifica case. Brief for Amici Curiae American Broadcasting Cos., Inc. et al., Pacifica (No. 77-528)
 
 
 [10]
 In Pacifica, Justice Stevens, joined by Chief Justice Burger and Justice Rehnquist, declined to address Pacifica's overbreadth challenge "because our review is limited to the question whether the Commission has the authority to proscribe this particular broadcast." 438 U.S. at 742, 98 S.Ct. at 3037. Justice Powell, however, in a concurring opinion joined by Justice Blackmun, appears to have concluded that the overbreadth argument should fail on the merits: "[S]ince the Commission may be expected to proceed cautiously, as it has in the past, I do not foresee an undue 'chilling' effect on broadcasters' exercise of their rights." Id. at 761 n. 4, 98 S.Ct. at 3047 n. 4 (Powell, J., concurring) (citation omitted)
 
 
 [11]
 As Justice Powell commented in Pacifica, except in the context of commercial speech, it is not the prevailing view that the degree of protection the first amendment provides depends on the Court's judgment as to the "value" of the speech in question. See 438 U.S. at 761-62, 98 S.Ct. at 3047 (Powell, J., concurring); see also id. at 762-63, 98 S.Ct. at 3047 (Brennan, J., dissenting) ("[T]he Court refuses to embrace the notion ... that the degree of protection the First Amendment affords protected speech varies with the social value ascribed to that speech by five Members of this Court.")
 
 
 [12]
 Broadcasting is a unique medium; it is not possible simply to segregate material inappropriate for children, as one may do, e.g., in an adults-only section of a bookstore. Therefore, channeling must be especially sensitive to the first amendment interests of broadcasters, adults, and parents
 
 
 [13]
 The Carlin monologue itself may be an example of indecent material possessing significant social value. See Pacifica, 438 U.S. at 730, 98 S.Ct. at 3000 (broadcaster explained that the "monologue had been played during a program about contemporary society's attitude toward language" and that "Carlin is not mouthing obscenities, he is merely using words to satirize as harmless and essentially silly our attitudes towards those words")
 Other examples that come readily to mind include descriptions of the doings of Gargantua and Pantagruel in Rabelais' classic, certain passages in the works of Joyce, words and phrases found in the writings of D.H. Lawrence, James Baldwin, and Frank Harris.
 
 
 [14]
 Though declining to defer absolutely to broadcasters' judgments of what is or is not indecent, the FCC has assured this court, at oral argument, that it will continue to give weight to reasonable licensee judgments when deciding whether to impose sanctions in a particular case. Cf. Reconsideration Order, 64 Rad.Reg.2d at 218-19 paras. 26, 27 & n. 44. Thus, the potential chilling effect of the FCC's generic definition of indecency will be tempered by the Commission's restrained enforcement policy. See also supra note 10 (Justice Powell states expectation that Commission will continue to proceed cautiously)
 
 
 [15]
 Petitioners do not challenge the FCC's requirement that programs containing indecent material be preceded by appropriate warnings. See Reconsideration Order, 64 Rad.Reg.2d at 220 para. 29. That aspect of the Commission's channeling regulation is not affected by this decision
 
 
 [16]
 The FCC notes on brief that the ratings services do not publish figures for children under 12, Brief for Respondents at 44 n. 46, but the orders under review do not mention that fact. Nor did the Commission say how it uses the 12-17 age group figures to reach conclusions about the younger group
 
 
 [17]
 The ratings service estimated 1,200 children 12-17 years old in the radio audience, of a total population in that age group of 4,900 within the City of Santa Barbara and 27,800 in the county. Since it is not clear whether the county figure includes the city population, the precise percentage is unknown; the estimated radio audience comprises 3.7 to 4.3 percent of the total age-group population
 
 
 [18]
 In the 1987 Pacifica Foundation order the FCC suggested that channeling can be viewed as a valid time, place, and manner restriction on speech. 2 FCC Rcd at 2699 para. 14 & n. 3; cf. Reconsideration Order, 64 Rad.Reg.2d at 215 para. 12. We disagree. Time, place, and manner regulations must be content-neutral. Pacific Gas & Elec. v. Public Utils. Comm'n of Cal., 475 U.S. 1, 20, 106 S.Ct. 903, 913, 89 L.Ed.2d 1 (1986). Channeling, however, is a content-based regulation of speech. See Boos v. Barry, --- U.S. ----, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988) (plurality opinion of O'Connor, J.): "Regulations that focus on the direct impact of speech on its audience [are not content-neutral]. To take an example factually close to Renton [v. Playtime Theatres, Inc., 475 U.S. 41 [106 S.Ct. 925, 89 L.Ed.2d 29] (1986) (ordinance regulating adult-movie theaters) ], if the ordinance there was justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies, then analysis of the measure as a content-based statute would have been appropriate." See also id. at 1171 (Brennan, J., concurring): "[A]ny restriction on speech, the application of which turns on the content of the speech, is a content-based restriction regardless of the motivation that lies behind it."
 Content-based restrictions ordinarily "may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." Consolidated Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980). The Supreme Court has recognized a government's interest in "safeguarding the physical and psychological well-being of a minor" as "compelling." New York v. Ferber, 458 U.S. 747, 756-57, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982) (quoting Globe Newspayer Co. v. Superior Court, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982)). But that interest, in the context of speech control, may be served only by carefully-tailored regulation. Here, the precision necessary to allow scope for the first amendment shielded freedom and choice of broadcasters and their audiences cannot be accomplished, we believe, unless the FCC adopts a reasonable safe harbor rule.
 
 
 [19]
 See Henkin, Morals and the Constitution: The Sin of Obscenity, 63 COLUM.L.REV. 391, 413 n. 68 (1963) ("While many of the constitutional arguments against morals legislation apply equally to legislation protecting the morals of children, one can well distinguish laws which do not impose a morality on children, but which support the right of parents to deal with the morals of their children as they see fit.")
 
 
 [20]
 The Pacifica Court also identified an interest in protecting the adult listener from intrusion, in the form of offensive broadcast materials, into the privacy of the home. 438 U.S. at 748-49, 98 S.Ct. at 3040; see also id. at 759-60, 98 S.Ct. at 3045-3046 (Powell, J., concurring). Neither the Reconsideration Order nor the underlying rulings relies on that rationale, however
 
 
 [21]
 Petitioners argue cogently that parental authority is enhanced, not reduced, if government permits programming at hours outside the workday hours common in the community, when most parents can supervise their children's listening. See also Pacifica Foundation v. FCC, 556 F.2d at 36 (Leventhal, J., dissenting) ("[F]or homes where parents really care about such matters there would be at least one parent in a position to monitor the material heard and seen [in the early evening]. A rule expanding the zone of the broadcastable to adult levels might apply when the time of broadcast is such that the great preponderance of children are subject to parental control.")