# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01341-COA

**WILLIAM ERVIN EDWARDS A/K/A**                **APPELLANT**
**NAPOLEAN EDWARDS A/K/A MARC**
**ANTHONY STANO**

**v.**

**STATE OF MISSISSIPPI**                                **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/07/2018 |
| TRIAL JUDGE: | HON. STEVE S. RATCLIFF III |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ERIN ELIZABETH BRIGGS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND RENDERED - 04/14/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE J. WILSON, P.J., McCARTY AND C. WILSON, JJ.

### J. WILSON, P.J., FOR THE COURT:

¶1. Mississippi Code Annotated section 97-45-17 (Rev. 2014) makes it a felony to "post a message for the purpose of causing injury to any person through the use of any medium of communication, including the Internet or a computer, . . . without the victim's consent." Following a jury trial, William Edwards was convicted of this offense and sentenced to serve five years in the custody of the Department of Corrections for posting Facebook Live videos in which he accused a local pastor of sexual misconduct.

¶2. On appeal, Edwards argues that his conviction must be reversed and rendered because

section 97-45-17 is unconstitutionally overbroad in violation of the Free Speech Clause of the First Amendment to the United States Constitution and unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We agree with Edwards that the statute violates the First Amendment. Therefore, we reverse and render his conviction.

### FACTS AND PROCEDURAL HISTORY

¶3. William Edwards was a self-styled "community activist fighting crime and corruption in [Jackson]." To that end, he formed a "liberal action committee" called "The Cipher." Edwards primarily used The Cipher's Facebook page[1] to engage with the public by posting live videos and messages and responding to comments. In his videos, Edwards typically discussed crime, corruption in local government, and other topics of local interest. Edwards testified that he received information for his posts and videos from sources in local government and other concerned citizens. Edwards's rambling videos were wide-ranging and included both his personal opinions and information from his sources. Edwards claimed that he or someone else fact-checked all of his information.

¶4. Edwards also worked at the Planet Fitness gym in Ridgeland. On October 31, 2016, Roderick Richardson, a local pastor, approached Edwards at the gym. Richardson was a member of the gym and was there to work out. According to Edwards, Richardson confronted him about his support for a candidate in the Jackson mayoral race. The exchange

---

[1] On Facebook, Edwards used the alias "Napoleon Edwards."

grew heated, and another employee asked Richardson to leave.

¶5.     After Richardson left, Edwards took a break and started a new live video on The Cipher's Facebook page. The eleven-minute, thirty-one-second video was admitted into evidence and played in full for the jury at trial. In the video, Edwards stated that Richardson (or "Pastor Rich") had accused him of "slandering [Richardson's] name." Edwards denied slandering Richardson, but he accused Richardson of having sex with a member of Richardson's church, whom Edwards referred to as a "little girl." Edwards said that the "little girl" slandered Richardson and that he (Edwards) just repeated what he had been told. Edwards then stated that he has a "Smith and a Wesson" and that if Richardson wanted to act like a "gangster," he (Edwards) would show Richardson "what real beef looks like." Edwards also stated that he was "coming to [Richardson's] church on Sunday," and he referenced Richardson's wife and children and Richardson's business address. Edwards warned Richardson to "be very careful" because he "might not see [Edwards] coming." And he stated that Richardson's gym membership was "probably deleted."

¶6.     Richardson testified that members of his church told him about the video. Richardson interpreted the video as a threat against him and his family. Richardson denied that he had ever engaged in or been accused of an inappropriate relationship with a church member.

¶7.     On November 2, Edwards posted another Facebook Live video. The entire fifty-minute, fifty-two-second video was admitted into evidence, but the State played only a one-minute, thirteen-second excerpt for the jury. The rest of the video had nothing to do with

3

Richardson. In the excerpt played in court, Edwards discussed "undercover" homosexuals in Jackson and called Richardson "the queen of them all." Edwards then stated that Richardson had been fired by another church due to "sexual misconduct." Edwards testified that a woman (whom he named at trial) told him that she had an affair with Richardson while she was a member of Richardson's former church. At trial, Richardson denied Edwards's accusations and denied that he had ever been fired for sexual misconduct.

¶8. Edwards posted another video to Facebook Live on November 11. The entire video, which runs one hour, fifteen minutes, and forty-seven seconds, was admitted into evidence. However, the State played only a twenty-three-second excerpt at trial. The rest of the video again had nothing to do with Richardson. In the November 11 excerpt, Edwards claimed that Richardson and a lawyer (whom he named at trial) conspired to have a woman sue Belhaven University for alleged sexual misconduct. Edwards suggested that Richardson hoped to receive some sort of financial kickback from the lawsuit. At trial, Edwards claimed that the plaintiff in the lawsuit was the same woman mentioned in the November 2 video. Edwards claimed that the woman had provided him with the information about the lawsuit and Richardson's role in it. However, Richardson denied any role in the alleged conspiracy.

¶9. Richardson testified that members of his church saw the videos and told him about them. He downloaded copies of the three videos and provided them to law enforcement. Richardson testified that the videos injured him personally, financially, and professionally. Richardson testified that he had lost at least fifteen paid speaking engagements and that his

4

church's attendance and revenue decreased after the videos were posted. Richardson also stated that he had received counseling to help him deal with the fallout from Edwards's videos. He testified that Edwards's allegations against him were untrue and that he did not consent to Edwards's posting of the videos.

¶10. Edwards testified in his defense. He admitted that he was angry when he made the October 31 video, but he wanted The Cipher's viewers to know that Richardson had threatened him at his place of work. He also wanted Richardson to know that he would not be bullied and would not change his position on the Jackson mayoral race. Edwards claimed that his November videos relied on information that he had received from two of Richardson's former church members. He denied that the October 31 post was made "in retaliation for what happened at the gym." Edwards also denied that he intended to injure Richardson by posting the videos. Rather, he claimed that he was "simply acting as a political activist" and trying "to provide the community" with "information" about ongoing "corruption" in local government and local churches.

¶11. Richardson and Edwards were the only two witnesses at trial. On the substance of the charge of posting injurious messages, the trial court instructed the jury as follows:

> The Court instructs the jury that WILLIAM ERVIN EDWARDS has been charged with the crime of *Posting of Injurious Messages*. If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1. On or about and between the dates of October 31, 2016 and November 17, 2016, in Madison County, Mississippi;
>
> 2. WILLIAM ERVIN EDWARDS did willfully, unlawfully, and

5

maliciously,

3.      Post a series of videos and pictures on Facebook without Roderick Richardson's consent

4.      For the purpose of causing injury to Roderick Richardson

then you shall find the Defendant, WILLIAM ERVIN EDWARDS guilty of *Posting of Injurious Messages*, as charged in the Indictment.

. . . .

"Post a message" means transferring, sending, posting, publishing, disseminating, or otherwise communicating or attempting to transfer, send, post, publish, disseminate or otherwise communicate information, whether truthful or untruthful, about the victim.

The jury returned a guilty verdict. Edwards filed a motion for a new trial, which was denied, and the court sentenced him to serve a term of five years in the custody of the Department of Corrections, with the sentence ordered to run consecutively to a sentence imposed in an unrelated false pretenses case.

## ANALYSIS

¶12. On appeal, Edwards argues that section 97-45-17 is unconstitutionally overbroad in violation of the Free Speech Clause of the First Amendment to the United States Constitution and unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[2] We review challenges to the constitutionality

---

[2] Edwards did not raise these issues prior to or during trial. He first alleged that the statute was unconstitutionally vague in his post-trial motion for a new trial, but even then he did not allege that the statute violated the First Amendment. However, the State has not argued that Edwards waived these issues. In addition, during oral argument, the State agreed

6

of a statute de novo. *Pascagoula Sch. Dist. v. Tucker*, 91 So. 3d 598, 603 (¶8) (Miss. 2012). In addition, when "the activity to be regulated is capable of reaching First Amendment rights, the statute . . . should be subjected to heightened scrutiny." *Smith v. City of Picayune*, 701 So. 2d 1101, 1103 (¶8) (Miss. 1997) (quoting *Nichols v. City of Gulfport*, 589 So. 2d 1280, 1283 (Miss. 1991)). For the reasons that follow, we hold that Edwards's conviction must be reversed and rendered because section 97-45-17 is unconstitutionally overbroad and facially invalid. Because we reverse Edwards's conviction on that ground, it is unnecessary to address his argument that the statute is also unconstitutionally vague.[3]

¶13. Under the "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). "The doctrine seeks to strike a balance between competing social costs." *Id.*

that this Court should address the merits of Edwards's claims that he was convicted under a facially unconstitutional statute. The State's position is consistent with our Supreme Court's decision in *Fulgham v. State*, 47 So. 3d 698, 700 (¶¶5-6) (Miss. 2010), which held that a facial challenge to the constitutionality of a statute could be raised for the first time in a motion for post-conviction relief. *See also Nolan v. State*, 182 So. 3d 484, 491-92 (¶28) (Miss. Ct. App. 2016) (holding that a claim that a statute was unconstitutionally vague could be raised for the first time on appeal despite the defendant's failure to challenge the constitutionality of the statute at trial).

[3] In his third issue on appeal, Edwards argues that his conviction should be reversed and rendered because the State presented insufficient evidence that he intended to "cause injury" to Richardson. Courts should avoid unnecessarily declaring a statute unconstitutional. *Groundworx LLC v. Blanton*, 234 So. 3d 363, 369 (¶28) (Miss. 2017). However, a rational jury could infer from Edwards's statements and demeanor in the videos that he intended to cause injury to Richardson. Therefore, the State presented sufficient evidence to support a conviction under the statute, which makes it necessary for this Court to address Edwards's constitutional challenge to the statute.

7

"On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *Id.* On the other hand, striking down a criminal statute that has at least some valid applications "has obvious harmful effects." *Id.* In an effort to strike an "appropriate balance" between these competing interests, the United States Supreme Court has held that a statute will not be declared facially unconstitutional unless its "overbreadth [is] *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.*

¶14.    Applying this test in *City of Houston v. Hill*, 482 U.S. 451 (1987), the Supreme Court struck down as unconstitutional a municipal ordinance that made it a misdemeanor "for any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest." *Id.* at 453, 455, 460-61. The city argued "that the ordinance [did] not inhibit the exposition of ideas" but only "ban[ned] 'core criminal conduct' not protected by the First Amendment." *Id.* at 459. However, the Supreme Court disagreed. *Id.* at 460. The Court reasoned that "the ordinance deal[t] not with core criminal conduct, but with speech." *Id.* The Court explained that although some verbal challenges to police officers are not protected, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Id.* at 461. Yet, the ordinance was not limited to unprotected speech such as "fighting words" or obscenity but rather criminalized any "speech that 'in any manner . . . interrupt[ed]' an officer." *Id.* at 462. The Court ultimately held that the ordinance was "substantially

8

overbroad" and "facially invalid," concluding its analysis as follows:

> [The] ordinance criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement. The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals—those chosen by the police in their unguided discretion—are arrested. Far from providing the breathing space that First Amendment freedoms need to survive, the ordinance is susceptible of regular application to protected expression.

*Id.* at 466-67 (citations, quotation marks, and ellipsis omitted).

¶15. We conclude that section 97-45-17 is substantially overbroad and invalid for similar reasons. The statute provides:

> A person shall not post a message for the purpose of causing injury to any person through the use of any medium of communication, including the Internet or a computer, computer program, computer system or computer network, or other electronic medium of communication without the victim's consent . . . .

Miss. Code Ann. § 97-45-17(1). In addition, "post a message" is defined as "transferring, sending, posting, publishing, disseminating, or otherwise communicating or attempting to transfer, send, post, publish, disseminate or otherwise communicate information, *whether truthful or untruthful*, about the victim." *Id.* § 97-45-1(t) (Rev. 2014) (emphasis added). Thus, the statute purports to criminalize *any* communication, *whether true or untrue*, that is intended to cause "injury to any person." Neither the statute nor the jury instructions in this case define the term "injury." In the absence of a narrower definition or limiting adjective, "injury" logically would include not only pecuniary and physical injuries but also reputational and emotional injuries. *See Wilcher v. State*, 227 So. 3d 890, 896-97 (¶¶33-38)

9

(Miss. 2017) (interpreting the term "harm" as used in the statutes criminalizing retaliation against public servants, Miss. Code Ann. §§ 97-9-101(d) & -127 (Rev. 2014)).

¶16.    As written, section 97-45-17 criminalizes a substantial amount of protected speech, including core political speech.  For example, "the Constitution surely protects" political "attack ads."  *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 260 (2003) (Scalia, J., concurring in part and dissenting in part), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).  Nonetheless, any person responsible for such political speech would be subject to criminal prosecution under section 97-45-17.  After all, the point of an attack ad is to injure the targeted candidate—to damage his or her reputation or popularity and ultimately to prevent his or her election or re-election.

¶17.    By its terms, the statute also criminalizes protected speech about public figures. Nothing in the statute requires the State to prove that the defendant knowingly or recklessly posted a false message.[4]  Indeed, as noted above, the statute criminalizes even perfectly *truthful* speech.  All that must be shown under the statute is that the speaker intended to cause some "injury" to the subject.

¶18.    Section 97-45-17 would also criminalize the famous *Hustler* magazine advertisement parodying the Reverend Jerry Falwell. *Hustler Magazine Inc. v. Falwell*, 485 U.S. 46 (1988).

---

[4] *But see New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (holding that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not").

The Supreme Court held that the First Amendment protected the parody although it was "patently offensive and . . . *intended* to inflict emotional injury" on Falwell. *Id.* at 50 (emphasis added). The Court explained that "[t]he appeal of the political cartoon or caricature is often based on exploitation of unfortunate physical traits or politically embarrassing events—an exploitation often *calculated to injure* the feelings of the subject of the portrayal." *Id.* at 54 (emphasis added). Indeed, "many things done with motives that are less than admirable are protected by the First Amendment." *Id.* at 53. Speech does not lose its protection under the First Amendment simply because "a speaker or writer is motivated by hatred or ill will." *Id.* (citing *Garrison v. Louisiana*, 379 U.S. 64, 73 (1964)). *Hustler* thus makes clear that section 97-45-17 does not survive First Amendment scrutiny simply because it is limited to messages sent "for the purpose of causing injury to any person." Miss. Code Ann. § 97-45-17.[5]

¶19.    The statute would also criminalize the Claiborne County boycott and related "peaceful political activity" that the Supreme Court held were entitled to constitutional protection in *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982). The Court held that the First Amendment protected the boycotters' speech even though the boycotters "*directly intended . . .* that the merchants would *sustain economic injury* as a result of their campaign."

---

[5] *See also, e.g.*, *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82 (1967) (holding that the First Amendment prohibited recovery in a civil libel action based on a jury finding that the defendant newspaper published editorials "with [a] bad or corrupt motive" or "from personal spite, ill will or a desire to injure [the] plaintiff).

*Id.* at 914 (emphasis added); *see also Thornhill v. Alabama*, 310 U.S. 88, 99 (1940) (holding that peaceful picketing by union organizers was protected by the First Amendment even though its avowed "purpose" was "to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer"). Yet, under section 97-45-17, such protected speech is made a felony punishable by up to five years' imprisonment.

¶20. We could provide additional examples of section's 97-45-17's overbreadth. But suffice it to say, the statute criminalizes a great variety and a substantial amount of constitutionally protected speech. It cannot be characterized as a regulation of criminal conduct that incidentally burdens speech. Rather, it is a clear and direct regulation of speech as speech. Similar to the ordinance in *Hill*, *supra*, this statute is "violated scores of times daily," and yet only a few unlucky individuals are ever prosecuted under it.[6] *Hill*, 482 U.S. at 466-67. Thus, the statute's overbreadth not only runs the risk of chilling protected speech but also results in arbitrary and erratic enforcement. *Id.*

¶21. While the statute could have some valid applications, there is nothing in its language that would serve to limit its reach to unprotected speech.[7] As shown above, speech does not

---

[6] There are no other reported decisions involving prosecutions under section 97-45-17.

[7] We note that section 97-45-15, which defines the offense of "cyberstalking," includes a safe harbor that expressly provides that it "does not apply to any peaceable, nonviolent, or nonthreatening activity intended to express political views or to provide lawful information to others" or to "any constitutionally protected activity, including speech, protest or assembly." Miss. Code Ann. § 97-45-15(3) (Rev. 2014). However, section 97-45-17 includes no similar safe harbor.

12

lose its constitutional protection simply because its purpose or intent is to cause injury. We conclude that the statute's potential valid applications pale in comparison to its overbreadth. That is, the statute's "overbreadth [is] *substantial*, not only in an absolute sense, but also relative to [its] legitimate sweep." *Williams*, 553 U.S. at 292. Therefore, the statute is facially invalid and unconstitutional, and Edwards's conviction must be reversed and rendered.[8]

## CONCLUSION

¶22. Section 97-45-17 violates the First Amendment to the United States Constitution because it is unconstitutionally overbroad. Therefore, we must reverse and render Edwards's conviction for the offense of "posting injurious messages."

¶23. **REVERSED AND RENDERED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

---

[8] We note that some of Edwards's statements could be interpreted as threats against Richardson or his family. The Constitution does not protect "true threats" of "unlawful violence" against a particular individual or group of individuals, *Virginia v. Black*, 538 U.S. 359-60 (2003), and the cyberstalking statute, Miss. Code Ann. § 97-45-15(1), specifically addresses threats via electronic communications. However, Edwards was not prosecuted for threatening Richardson or his family, and nothing in the jury instructions addressed the issue of true threats. Rather, the jurors were instructed that they should return a guilty verdict if they found that Edwards posted messages—whether true or untrue—for the purpose of causing some undefined "injury" to Richardson. For the reasons explained above, a conviction on that basis is inconsistent with the freedom of speech protected by the First Amendment.